## In re LONGHORN SECURITIES LITIGATION.

MDL Docket No. 525.

Nos. CIV–82–1415–E, CIV–82–1528–E, CIV–82–1529–E, CIV–82–1575–E, CIV–82–1679–E, CIV–82–1681–E, CIV–82–1898–E, CIV–82–2260–E to CIV–82–2262–E, CIV–82–2265–E to CIV–82–2267–E, CIV–82–2269–E to CIV–82–2288–E, CIV–82–2290–E to CIV–82–2303–E, CIV–83–247–E to CIV–83–249–E, CIV–83–251–E to CIV–83–256–E, CIV–83–272–E to CIV–83–277–E and CIV–83–373–E.

United States District Court,
W.D. Oklahoma.

Sept. 28, 1983.

See also 552 F.Supp. 1003; 573 F.Supp. 274; 573 F.Supp. 255.

John C. McMurry, Oklahoma City, Okl. and H. Thomas Coghill, David J. Richman, Coghill & Goodspeed, Denver, Colo., for plaintiffs.

Murray E. Abowitz, Noma Gurich, Abowitz & Welch, G. Blaine Schwabe, III, Mock, Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, Okl., Charles C. Baker, Richard B. Noulles, Gable & Gotwals, Tulsa, Okl., McAfee & Taft, John N. Hermes, James Kirk, Kirk & Chaney, John Goodman, Charles C. Green, Harry A. Woods, Jr., Oklahoma City, Okl., for defendants.

## ORDER

EUBANKS, Chief Judge.

The defendant Federal Deposit Insurance Corporation [hereinafter "FDIC"], as receiver for the failed Penn Square Bank, N.A., has moved to dismiss these consolidated actions based upon two independent grounds, failure to plead fraud with specificity as required by Federal Rule of Civil Procedure 9(b) and failure to state a claim upon which relief can be granted pursuant to Federal Rule 12(b)(6). Each ground is advanced separately in one motion, but is incorporated by reference in the other. This order shall address the FDIC's Rule 12(b)(6) motion; its Rule 9(b) motion is addressed in another Order of this Court, also entered on this day. The gravamen of the FDIC's Rule 12(b)(6) motion is that the plaintiffs are precluded from advancing their claims against the FDIC by the federal common law rule of estoppel seminally stated in *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 453–62, 62 S.Ct. 676, 677–81, 86 L.Ed. 956 (per Douglas, J.) (1942). For the reasons set forth below, the motion is denied.

### I.

It is well established that a complaint should not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In the context of a motion to dismiss, the Court must construe the challenged pleading in the light most favorable to the plaintiff, must accept as true all well-pleaded factual allegations and reasonable inferences therefrom, and must disregard all legal or unsupported conclusions. *Mitchell v. King*, 537 F.2d 385, 386 (10th

Cir.1976). Further, the complaint should not be dismissed merely because the plaintiff's allegations do not support his stated legal theory, for the Court is obliged to determine whether the allegations support relief on any possible theory. *See Perington Wholesale, Inc. v. Burger King Corp.,* 631 F.2d 1369, 1375 n. 5 (10th Cir.1980) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (1969)).

## II.

### A.

To apply *D'Oench, Duhme* and its progeny would be legally erroneous and manifestly unjust. The Court's holding in *D'Oench, Duhme* is a narrow one and is best understood in light of its facts: The petitioner, a securities firm, sold to a bank certain bonds that later defaulted. Then, to enable the bank to conceal the past due bonds on its books from the federal and state banking authorities, the petitioner executed notes of equal value to the bank, with the understanding written on a receipt (but not on the notes themselves) that they would not be called for payment and that all interest would be repaid. To maintain the notes' status as "live paper", the petitioner made some interest payments, and later still it executed another note, renewing the originals. Subsequently, the FDIC insured the bank based on the state banking authority's certification of the bank's solvency, which in turn was based on the authority's examination of the bank's books. The bank failed, and the FDIC acquired the petitioner's renewal note as part of the collateral securing a loan of more than $1,000,000 to permit another, open bank to assume the closed bank's insured deposits. The petitioner answered the FDIC's suit on the note, alleging that no consideration was given for the note and that the written agreement on the receipt estopped the FDIC from collecting. *See D'Oench, Duhme, supra,* 315 U.S. at 454, 456, 62 S.Ct. at 678, 679.

■ Two issues were before the Court in *D'Oench, Duhme;* the one relevant here, as Justice Jackson framed it in his concurrence, was "whether one may plead his own scheme to deceive a bank's creditors and supervising authorities as against the [FDIC]." [1] Addressing this issue, the majority held that an accommodation maker who executes a secret agreement may not "tak[e] advantage of an undisclosed and fraudulent arrangement which the statute condemns and which the maker of the note made possible." *Id.* at 461, 62 S.Ct. at 681 (majority opinion). It makes no difference that the defendant may not have intended to deceive anyone or that creditors may not in fact have been deceived. *Id.* at 458–59, 62 S.Ct. at 679–80 (majority opinion). Rather,

> the test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 681 (majority opinion). Thus, there are four elements necessary to the assertion of *D'Oench, Duhme* estoppel: (1) the FDIC must be the party

---

**1.** The second issue, indeed more important to the Court, was "what law is applicable." *D'Oench, Duhme, supra,* 315 U.S. at 455, 62 S.Ct. at 678 (majority opinion). This issue, which Justice Jackson accurately recognized "is met inescapably at the threshold of [the] case", *id.* at 465, 62 S.Ct. at 683, reflected the jurisprudential uncertainty in the post-*Erie v. Tompkins* universe. Justice Douglas, writing for the majority, relied on the policies of the Federal Reserve Act, of which the Federal Deposit Insurance Act was then a part. 12 U.S.C.A. §§ 264(a)–(z) (1945). Justice Frankfurter, joined by Chief Justice Stone, facilely avoided the problem, reasoning that the result was the same regardless of "[w]hether the case is governed by the law of one State or the other or by 'federal common law' drawn here from one State or the other ..." *Id.* at 462, 62 S.Ct. at 681. Finally, Justice Jackson in a thorough and persuasive concurrence argued that *Erie* applied only in diversity cases and that in cases involving federal questions, such as in the instant cases, it was necessary to employ federal common law to interpret federal statutes. *Id.* at 465–75, 62 S.Ct. at 683–88.

against whom the claim or defense is asserted, and (2) the party asserting the claim or defense must have lent himself (3) to a secret agreement (4) that deceived or would tend to deceive the FDIC.

### B.

It is clear from the allegations at bar that *D'Oench, Duhme* does not apply. Although the FDIC's motion challenges the legal sufficiency of 63 individual actions involving well over 200 parties, the material allegations can be fairly summarized, especially in light of the liberal pleading rules enunciated above: Between 1978 and 1981, Longhorn Oil and Gas Company formed a number of Oklahoma limited partnerships to explore for and to develop oil and gas resources [hereinafter "Longhorn limited partnerships"], in which certain of its insiders and subsidiaries served as general partners. Interests in these Longhorn limited partnerships were never registered as securities, either with the federal Securities and Exchange Commission or with the appropriate state securities commissions. Nevertheless, those interests were offered and sold to investors across the country. Moreover, the Longhorn and Penn Square Bank defendants and certain of their officers, directors, and agents (whether as principals, aiders and abettors, or control persons) induced the plaintiffs to invest by means of false and misleading representations or omissions of material facts, including: the quality and ability of partnership management; the success of previous Longhorn limited partnerships; the availability of producing wells to any partnership not generating sufficient revenue; the creditworthiness of the partnerships; the likelihood of participating with major oil and gas companies in high quality prospects; the availability of pertinent geological, geophysical, financial, and other information; and the use of investor funds. Investors purchased their interests either in cash or by a combination of cash and credit. Under the latter purchase option, Penn Square Bank loaned to the limited partnerships the amount of their limited partners' investments (less any cash paid);

these loans were secured by standby letters of credit in favor of Penn Square Bank, obtained by each investor from his or her own bank. In conjunction with this purchase option, some of the Penn Square Bank and Longhorn defendants represented to some investors that if the limited partnerships were successful, those loans would be paid out of production income, and their letters of credit would be released. Apparently, however, the limited partnerships did not prosper, production did not retire the loans, and Penn Square Bank began to call on the letters of credit when the loans went unpaid. Finally, on July 5, 1982, Penn Square Bank itself was declared insolvent, and the FDIC was appointed its receiver.

### C.

■ First, these are not cases, like *D'Oench, Duhme*, where the maker of an instrument has contributed to a plan to deceive the banking authorities, whether intentionally or not; instead, the plaintiffs claim to have been the innocent victims of a grand scale, fraudulent scheme to sell Longhorn limited partnership interests and to finance the purchase of those interests through Penn Square Bank. *D'Oench, Duhme*, therefore, is inapposite. Indeed, Justice Jackson presaged this sort of scenario in carving out an exception to the *D'Oench, Duhme* rule: "[W]here ordinary and good-faith commercial transactions are involved ... [the FDIC] would succeed only to the rights which the bank itself acquired ..." *D'Oench, Duhme, supra*, 315 U.S. at 474, 62 S.Ct. at 687 (Jackson, J., concurring).

These cases bear a closer resemblance to *Federal Deposit Insurance Corporation v. Meo*, 505 F.2d 790, 790–93 (9th Cir.1974), in which the Ninth Circuit Court of Appeals refused to apply the equitable estoppel doctrine of *D'Oench, Duhme*. In that case, Meo and three associates executed a promissory note to the San Francisco National Bank [hereinafter "SFNB"] to purchase 1,000 shares of SFNB common stock. However, SFNB instead transmitted 1,000

voting trust certificates on behalf of the purchasers. They never saw the trust certificates and were unaware of the improper transmittal because the certificates were held by SFNB as security for the loan. Soon after the original purchase, Meo's associates sold their stock to discharge their debt, but Meo did not; still unaware of the mis-execution of his order, he signed a new note for his share of the balance due. SFNB later became insolvent, and the FDIC was appointed receiver. Only after the FDIC sued on Meo's note did he find out that he had been issued voting trust certificates which did not have voting rights, rather than common stock which did. Because Meo was innocent of any wrongdoing or negligence, he was not estopped from asserting the defense of no consideration to the FDIC's suit on the note.

### D.

Second, these cases do not involve a secret agreement; indeed, they do not involve an agreement at all. Rather, the plaintiffs uniformly allege that certain of the Penn Square Bank and Longhorn defendants merely *represented* to them that their letters of credit would not be called or would not likely be called. *See* FDIC's Reply Brief, Exhibit "A" (collecting the relevant allegations). Both linguistically and legally, a representation is not an agreement. *Webster's* defines a representation as "a statement or account, esp[ecially] made to convey a particular view or impression of something with the intention of influencing opinion or action", *Webster's Third New International Dictionary* 1926 (1981), whereas an agreement is defined as "the act of agreeing or coming to a mutual arrangement". *Id.* at 43. Likewise, *Black's Law Dictionary* defines a representation as "[a]ny conduct capable of being turned into a statement of fact", *Black's Law Dictionary* 1169 (5th ed. 1979) (citation omitted), whereas an agreement is defined as "a concord of understanding and intention between two or more parties with respect to the effect upon their relative rights and duties, of

certain past or future facts or performances." *Id.* at 62.

### E.

■ Finally, in these cases there was no fraudulent overstatement of the bank's assets which would deceive or tend to deceive the FDIC. The plaintiffs here do not allege that the instruments they executed to secure the limited partnership loans were never valuable or were only to accommodate the bank in perpetrating a fraud on the banking authorities. To the contrary, the plaintiffs admit that these instruments were and are valuable; their contention is that they were told their liability would terminate when and if there was sufficient production to replace those instruments.

Indeed, given the allegations at bar and given the nature of letter of credit financing, the plaintiff-investors simply could not have contributed to a fraudulent over-statement of Penn Square Bank's assets. There are typically three separate contracts in a letter of credit transaction: the underlying sales contract between buyer and seller; the contract between the buyer-customer and its bank, whereby the bank issues the letter of credit; and the contract between the issuing bank and the seller-beneficiary, whereby the beneficiary is empowered to draw on the letter after presenting certain specified documents. *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 464–65 (2d Cir.1970). *See* 3 R. Anderson, *Uniform Commercial Code* § 5–101:6 (2d ed. 1971 & Supp.1982). Further, it is axiomatic that the letter of credit contract between the issuing bank and the beneficiary is independent of the underlying sales contract between the buyer-customer and the seller-beneficiary. Uniform Commercial Code § 5–114(1) and Official Code Comment 1; Uniform Customs and Practice for Documentary Credits art. 8a (1974 revision) (International Chamber of Commerce publication no. 290); *First Empire Bank-New York v. Federal Deposit Insurance Corp.,* 572 F.2d 1361, 1366 (9th Cir.1978); *Venizelos, S.A., supra,* 425 F.2d at 465; 3 R. Anderson, *supra,* § 5–114:7. In the

cases at bar, the letters of credit were issued by the plaintiff-investors' own banks in favor of Penn Square Bank as beneficiary. Therefore, even assuming *arguendo* that the plaintiff-investors and Penn Square Bank had entered into secret *agreements* that their letters would not be called, those agreements would not be binding on the issuing banks whose credit was independently engaged.

Accordingly,

IT IS THEREFORE ORDERED that the FDIC's Rule 12(b)(6) motion to dismiss be and hereby is denied.

The Clerk of the Court is instructed to mail copies hereof to liaison counsel.