**FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, a corporate agency of the United States, Plaintiff,**

v.

**TWT EXPLORATION COMPANY, INC., Robert J. Piner, a/k/a R.J. Pinder, Charles E. Carter, Bob Alexander and William A. Jenkins, Defendants.**

**Bob ALEXANDER, Defendant and Third-Party Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Penn Square Bank N.A., Third-Party Defendant.**

**No. 83–1857–B.**

United States District Court, W.D. Oklahoma.

Dec. 27, 1985.

Stipulation Jan. 14, 1986.

---

William J. Reifman and Barbara Bertok of Mayer, Brown & Platt, Chicago, Ill., Jimmy Goodman of Crowe & Dunlevy, Oklahoma City, Okl., for plaintiff.

Michael E. Joseph and W. Chris Coleman of McAfee & Taft, Oklahoma City, Okl., for defendant and third-party plaintiff.

Sidney G. Dunagan of Gable & Gotwals, Tulsa, Okl., for third-party defendant.

BOHANON, District Judge.

This matter is now before the court upon three separate motions for summary judgment. The plaintiff, Federal Deposit Insurance Corporation, in its corporate capacity ("Corporate FDIC"), seeks judgment as to liability on Count V of its Amended Complaint against defendant Bob Alexander, and on Count VI against defendant William A. Jenkins, on the basis of these defendants' alleged unconditional, unlimited guarantees of $9,050,106.59 worth of indebtedness of an Oklahoma corporation, J.P. Exploration, Inc. ("J.P. Exploration"). Bob Alexander has himself filed a motion for summary judgment in his favor on Corporate FDIC's claims against him. Lastly, the third-party defendant Federal Deposit Insurance Corporation, as Receiver of Penn Square Bank, N.A. ("Receiver FDIC"),[1] moves for summary judgment against Alexander on his third-party complaint which seeks to hold Receiver FDIC accountable for alleged wrongdoing on the part of either the now defunct Penn Square Bank or Receiver FDIC itself in connection with the same guarantees used by Corporate FDIC as the basis for its claims against Alexander.

---

1. In this opinion "FDIC" standing alone without "Corporate" or "Receiver" preceding constitutes a reference to the Federal Deposit Insurance Corporation generally, and not specifically to either of its capacities as party to this action.

The court recognizes from the outset that Corporate FDIC and Receiver FDIC are separate and distinct legal entities. The possibility that FDIC may act simultaneously in a dual capacity under its governing statutes was recognized as early as 1961 in *Freeling v. Sebring*, 296 F.2d 244 (10th Cir.1961); *see also Jones v. Federal Deposit Ins. Corp.*, 748 F.2d 1400, 1402 (10th Cir.1984); *Federal Deposit Ins. Corp. v. Ashley*, 585 F.2d 157 (6th Cir. 1978); *Federal Deposit Ins. Corp. v. Godshall*, 558 F.2d 220 (4th Cir.1977); *Federal Deposit Ins. Corp. v. Glickman*, 450 F.2d 416 (9th Cir.1971). The legal distinction between the two facets of FDIC's operations as corporate insurer and as receiver must be recognized even where a note is transferred from the one branch of FDIC to the other and "FDIC did not maintain separate offices for its receiver and insuror capacities, and ..: the same FDIC personnel who acted for the FDIC as receiver also acted for the FDIC as corporate insuror." *Gunter v. Hutcheson*, 674 F.2d 862, 873–74 (11th Cir.1982); 12 U.S.C. § 1823(d).

In the present case the difference in functions is much easier to perceive than in *Gunter* since Corporate FDIC did not acquire the notes and guarantees underlying the suit directly from Receiver FDIC but rather from Continental Illinois National Bank and Trust Company of Chicago ("Continental") which had originally participated in the loans made by Penn Square Bank, N.A. ("Penn Square"). After Penn Square was declared insolvent, Receiver FDIC agreed to transfer all of the defunct bank's right, title and interest in the loans to Continental on July 28, 1983. Thereafter on August 3, 1983, Continental commenced this suit, though Alexander and Jenkins were not joined as defendants until the filing of an amended complaint on March 19, 1984. When Continental itself subsequently became unstable, the subject loans were purchased by Corporate FDIC on September 26, 1984, as part of the government's corrective action or "bailout" to protect the national banking system from the possible collapse of that bank. Based on this last transfer of interest, this court, on April 8, 1985, granted Continental's Motion for Substitution of Party-Plaintiff pursuant to F.R.Civ.P. 25(c), and since that date Corporate FDIC alone has been the plaintiff in this cause. *Receiver* FDIC did not become a party to the action until April 29, 1985, when Alexander filed his third-party complaint.

■ This third-party complaint must be dismissed outright because it fails to allege facts supporting this court's jurisdiction. The pleading, which asserts several claims sounding in tort against Receiver FDIC, states that this court has jurisdiction under 12 U.S.C. § 1819 which allows FDIC to "sue and be sued" and grants United States courts original jurisdiction of "[a]ll suits of a civil nature at common law or in equity to which [FDIC] ... shall be a party...." The FDIC is, however, a federal agency within the meaning of the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, and Alexander's action, therefore, must proceed, if at all, directly against the United States in conformity with the requirements of the FTCA. *Freeling v. Federal Deposit Ins. Corp.*, 221 F.Supp. 955 (W.D.Okla.1962) *affirmed* 326 F.2d 971 (10th Cir.1963); *Federal Deposit Ins. Corp. v. Citizens Bank & Trust Co.*, 592 F.2d 364 (7th Cir.1979); *Safeway Portland E.F.C.U. v. Federal Deposit Ins. Corp.*, 506 F.2d 1213 (9th Cir.1974); *Segarra Ocasio v. Banco Regional de Bayamon*, 581 F.Supp. 1255 (D.Puerto Rico, 1984); 28 U.S.C. § 2679(a). Alexander has failed to plead jurisdiction under the FTCA and also has not alleged facts constituting compliance with the procedural requirements of that Act, including the filing of an administrative claim with the appropriate federal agency and a final denial of the administrative claim by that agency. 28 U.S.C. § 2675(a). This court, therefore, lacks jurisdiction over the subject matter of Alexander's third-party complaint, and it must be dismissed. *Lann v. Hill*, 436 F.Supp. 463 (W.D.Okla.1977); F.R.Civ.P. 12(h)(3). Receiver FDIC's motion for summary judgment on the third-party complaint will be mooted by this dismissal.

Turning to the remaining motions, the entry of summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). "In determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion, drawing all inferences most favorable to that party." *Harlow v. Fitzgerald*, 457 U.S. 800, 816 n. 26, 102 S.Ct. 2727, 2737 n. 26, 73 L.Ed.2d 396 (1982); *Norton v. Liddel*, 620 F.2d 1375 (10th Cir. 1980). In the present case, Alexander is both a moving and an opposing party, but the court deems it appropriate in the circumstances to give him the benefit of the doubt with respect to any facts alleged by him. In accordance with these principles, the relevant facts, only for the purposes of resolution of the pending motions, are as follows:

In 1980, J.P. Exploration was incorporated. Charles E. Carter, R.J. Pinder,[2] Bob Alexander and William A. Jenkins were named as directors of the corporation which was intended to operate as an oil and gas drilling company. Prior to the incorporation of J.P. Exploration, Alexander had already formed an oil and gas operating company, Alexander Energy Company. Because Pinder wanted to establish ties to Alexander Energy as a source of potential business for the new drilling company, Alexander agreed to participate in J.P. Exploration to the extent of a 10 percent shareholder.

In October of 1980, the four directors of J.P. Exploration met in Pinder's office in Oklahoma City to discuss corporate business, including the acquisition of additional drilling rigs. Alexander opposed the proposed acquisitions and stated that he was unwilling to finance any rigs or lend his personal credit to the financing of rigs. He did, however, agree to guarantee 10 percent of a $500,000 line of credit from Penn Square and signed a blank form of guaranty which was undated, did not state that it was furnished to guarantee debts of J.P. Exploration and did not bear on its face any express limitation of the amount of liability. According to Alexander, he orally advised Pinder that the guaranty should be completed to provide that Alexander's liability was limited to 10 percent of the $500,000 working capital line of credit, or $50,000.

The guaranty Alexander signed was delivered to Penn Square and shortly after the October, 1980, meeting Alexander called William G.P. Patterson, a loan officer at Penn Square, and confirmed with him that the guaranty was limited to 10 percent of a $500,000 working capital line of credit. Patterson also agreed to send Alexander a copy of the guaranty, but failed to do so.

Alexander never received any dividends or other financial benefits from J.P. Exploration and, in the late summer of 1981, Alexander resigned his position as director of the company and surrendered his stock in the company upon the advice of counsel in order to avoid potential conflicts of interest with Alexander Energy Corporation, which was going public. Alexander sent Patterson a copy of his letter of resignation to Pinder, dated July 27, 1981, and notified Patterson by telephone of his resignation and surrender of stock. Alexander asked Patterson that he be released and discharged from all existing and future liability under his guaranty and Patterson orally agreed, assuring Alexander that he was never liable for any J.P. Exploration debt anyway, that Penn Square had never relied on the guaranty in making loans to J.P. Exploration, and that the guaranty should

---

**2.** R.J. Pinder and Charles E. Carter, along with TWT Exploration Company, Inc., were also named as defendants by the amended complaint in this action. TWT Exploration Company, Inc., has since filed for protection under Chapter 11 of the Bankruptcy Code, thereby automatically staying this action against it. Default judgment was entered against Pinder in this case on February 1, 1985. Service has not been obtained on Carter.

not be in any of Penn Square's loan files. Alexander did not offer or give any consideration for this release.

Alexander subsequently believed his guaranty would be destroyed, but Patterson instead kept it, still blank in his desk drawer, until Penn Square was declared insolvent. The document was then filled in by an employee of either Penn Square or Receiver FDIC in a manner not in accord with Alexander's original instructions. The document was dated March 31, 1981, and in the blank after the printed sentence which read: "It is understood that the amount of credit extended by or liability incurred to you is limited to:", in place of a limitation to 10 percent of $500,000, the word "unlimited" was typed. Alexander was not aware until this suit commenced of any of the loans made by Penn Square to J.P. Exploration which are now sued upon by Corporate FDIC.[3]

The Alexander guaranty is not listed on some of Penn Square's internal paperwork with respect to these loans although it is listed on the commercial loan worksheets for notes Nos. 26994 and 26993. A deposition of Patterson attached to one of FDIC's briefs indicates that Penn Square loan officers did not always list all guaranties on loan memos and applications. Reference to the guaranty, along with a financial statement for Alexander, does appear in the minutes of the May 27, 1981, meeting of Continental's loan committee (credit policy committee) which discuss Continental's participation in Penn Square loans to J.P. Exploration; however, a subsequent Continental memorandum dated March 30, 1982, does not list Alexander as a guarantor of other loans.

Corporate FDIC concedes that the original of Alexander's guaranty cannot now be found. However, the copy Corporate FDIC received through Continental from Receiver FDIC bears on its face a stamp indicating that the original existed and was included among documents subpoenaed when a grand jury of the Western District of Oklahoma investigated matters concerning Penn Square after that bank closed.

Corporate FDIC premises William A. Jenkins' liability for the notes in question upon two separate guaranties. One, dated October 7, 1980, has "(UNLIMITED)" typed in the space provided for limitations. The other, dated September 25, 1981, states that Jenkins' liability is limited to $250,000. Jenkins denies that he would have signed an unlimited guaranty for J.P. Exploration but concedes that he may have signed a blank guaranty at the October, 1980, meeting with Alexander, Pinder and Carter, and further admits that Patterson already held blank guaranties signed by Jenkins at that date. The signatures on the guaranties held by Corporate FDIC are authentic, but the documents have been filled in contrary to Jenkins' instructions.

Jenkins had a falling out with Pinder by the fall of 1981 and did not sign or authorize the $250,000 guaranty on September 25 of that year as the document indicates. Jenkins did not, however, inform Patterson that he was withdrawing from J.P. Exploration until he talked with Patterson in late October or November and advised him that his (Jenkins') attorneys had told him to sever his relationship with any petroleum service companies. Patterson at that time tried to persuade Jenkins to stay with J.P. Exploration because he thought it would be very profitable. Subsequently, in late January or February of 1982 Jenkins met with Patterson in Oklahoma City to discuss his personal financial dealings with Penn Square. During the course of that meeting, the matter of the J.P. Exploration

---

3. These loans are evidenced by the following notes:

(1) No. 26994 for $3,330,000 dated March 31, 1981;

(2) No. 26993 for $2,800,000 dated March 31, 1981;

(3) No. 27659 for $1,500,000 dated May 29, 1981;

(4) No. 28960 for $500,000 dated September 25, 1981.

The notes all provide for interest at a floating rate 1½ percent above Penn Square prime and for payment of reasonable costs of collection, including an attorney's fee of 15 percent of all sums due upon default.

guaranty came up again, and Jenkins told Patterson that he wanted out of any obligation or involvement with J.P. Exploration. Patterson replied: "Don't worry, I'll take care of it." There were no witnesses to this conversation, however, and Jenkins did not demand the physical return of his guaranty. Jenkins formally notified the other officers and directors of J.P. Exploration of his decision to resign as officer and director of the company by a letter dated March 10, 1982.

Thereafter in May of 1982, Jenkins was again at Penn Square on business when he encountered Janelle Cates, another bank employee who worked with Patterson. Cates asked Jenkins if he was aware that Pinder was planning to sell J.P. Exploration and that he, Jenkins, was still on the guaranty. Jenkins acknowledged the pending merger but strongly denied being on the guaranty and told Cates that Patterson had assured him he was completely out of all business connected with J.P. Exploration. Immediately afterwards, Jenkins sent a letter to Patterson, with a copy to Cates, referring to the earlier conversation with Patterson and recounting Jenkins' understanding that Patterson had granted Jenkins a release from all his financial obligations connected with J.P. Exploration. Jenkins also advised Patterson that he had learned that Pinder obtained sizeable loans for J.P. Exploration without Jenkins' knowledge or approval. Neither Patterson nor Cates ever acknowledged this letter.

■ Having thus given Alexander and Jenkins the full benefit of the doubt with respect to the facts they allege, the court must now conclude that the only *material* fact in the lot is that both of these defendants admit signing the guaranties Corporate FDIC now sues upon. The immateriality of the remainder of the facts recounted above stems from the unique status accorded the FDIC by Congress and recognized by the courts, beginning with the

landmark case of *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Briefly, that case held that one who gives a note to a bank insured thereafter by FDIC cannot defend an action on the note brought by FDIC as purchaser of bank assets, including the note, on the basis of any unwritten agreement that the note would be unenforceable. Although *D'Oench* is still cited often by the cases, the principles enunciated in it have since been codified and expanded into more generally applicable language by Congress in the Federal Deposit Insurance Act § 2[13](e) codified at 12 U.S.C. § 1823(e).[4] That statute provides that

> No agreement which tends to diminish or defeat the right, title or interest of [FDIC] in any asset acquired by it under this section either as security for a loan or by purchase, shall be valid against [FDIC] unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

This language is very clear and straightforward and leaves no room for doubting that the guaranties signed by the defendants in this case are enforceable in full and cannot be defeated by any evidence of oral conversations that defendants may have had with Pinder or Patterson or by letters signed only by the defendants but not executed by Penn Square, approved by its loan committee and made an official record of that bank. Not one of the cases cited by de-

---

4. *Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981) and *Federal Deposit Ins. Corp. v. Hoover-Morris Enterprises*, 642 F.2d 785 (5th Cir.1981) do not stand for the proposition that

§ 1983(e) says no more than *D'Oench*, as defendants' response brief to Corporation FDIC's motion seems to imply.

fendants in their briefs supports their arguments to the contrary.

Defendants themselves cite the case of *Federal Deposit Ins. Corp. v. Powers*, 576 F.Supp. 1167 (N.D.Ill.1983) *affirmed mem.*, 753 F.2d 1076 (7th Cir.1984) for its statement that "the language of § 1823(e) only denies validity to certain unwritten agreements, and does not bar extrinsic proof that a written document in fact does not reflect any valid agreement." 576 F.Supp. at 1170, citing *Gunter v. Hutcheson*, 674 F.2d at 867. Their citation of *Powers* is plainly audacious, however, since it held, on facts remarkably similar to those now at issue, that one who gave an insured bank guaranty forms signed in blank could not defend an action brought by FDIC on one of the guaranties by asserting that the guaranty was invalid because bank officials filled in the blanks in a manner contrary to his informal, unwritten arrangements and understandings with them. The *Powers* court noted that "Powers wishes ultimately to prove that no guarantee contract ever existed, but that does not change the fact that he is asserting the type of private agreement that is invalidated by § 1823(e)." 576 F.Supp. at 1171 (footnote omitted); *Cf. Federal Deposit Ins. Corp. v. Webb*, 464 F.Supp. 520 (E.D.Tenn.1978) (notes signed in blank).

Alexander also cites *In Re Longhorn Securities Litigation*, 573 F.Supp. 278 (W.D.Okla.1983), apparently in an attempt to use some of the oral statements Patterson made to him as an escape from the doctrine of *D'Oench* by claiming that they constituted false and misleading representations designed to defraud Alexander, rather than a secret agreement in fraud of the FDIC. In *In Re Longhorn*, the plaintiff investors claimed they had been induced to purchase limited partnership inter-

ests by representations made by some of the defendants that stand-by letters of credit, used to secure loans made by Penn Square to the investors to finance their purchases, would not be called or would not likely be called. The court found *D'Oench* inapplicable. In the present case, the defendants' response brief to corporate FDIC's motion states: "Alexander's defense also arises from the representation made to him at the time by Bill Patterson that he was never liable on any of the debts of [J.P. Exploration] anyway." The curious thing about this assertion lies in the words, "at the time." According to Alexander himself, Patterson's assertion that Alexander was never liable for J.P. Exploration debts anyway was made in a conversation nearly a year after Alexander admits he signed the blank guaranty. Further, Alexander also clearly signed the guaranty before ever talking to Patterson about the alleged limitation of liability. The "representations" therefore could not possibly have induced Alexander's signature. Without commenting on the correctness of the *In Re Longhorn* decision the court must note that upon its facts it is thoroughly and obviously distinguishable from the present circumstances.[5] The defendants' unexplained use of the words "at the time" in conjunction with citation of *In Re Longhorn* bears an uncomfortable resemblance to a deliberate and poorly concealed attempt to mislead the court.

Alexander also attempts to conjure a defense of want of consideration out of Patterson's comment that Alexander's guaranty had never been used by Penn Square. The gist of the argument, which is unsupported by citation of any authority other than the very general language of 15 Okla. Stat. § 323 (1981),[6] is that Penn Square did

---

**5.** It may be noted that in the *In Re Longhorn Securities Litigation* opinion the court construed *D'Oench* narrowly, 573 F.Supp. at 280, and for reasons unknown did not mention or address the expanded doctrine codified in § 1823(e). Because the present decision is based on the express language approved by Congress subsequent to *D'Oench,* the *Longhorn* opinion would be of questionable precedential value even if the

facts of that case were plausibly similar to those at hand.

**6.** Where a guaranty is entered into at the same time with the original obligation, or with the acceptance of the latter by the guarantee, and forms, with that obligation, a part of the consideration to him, no other consideration need exist. In all other cases there must be a

not rely on the guaranty in extending credit to J.P. Exploration, and the guaranty remained in blank form until after the loans were made, so the guaranty fails for want of a distinct supporting consideration. This reasoning presupposes a reading of the Oklahoma statute's language referring to the time when "a guaranty is entered into" to mean when "a guaranty is completed in all respects."

The court is inclined instead to adopt a more natural understanding and hold that Alexander entered into the guaranty when *he* signed it, not when someone else filled in the remaining blanks. This is the understanding demanded by the public policy of protecting the FDIC behind § 1823(e). At the moment Alexander signed the guaranty in blank, he "lent himself to a transaction which [was] likely to mislead banking authorities." *Federal Deposit Ins. Corp. v. Investors Associates X.*, 775 F.2d 152, 154 (6th Cir.1985) (discussed *infra*); *D'Oench,* 315 U.S. at 460, 62 S.Ct. at 680–81. It is irrelevant for the purposes of § 1823(e) whether Penn Square *relied* on the guaranty in making loans to J.P. Exploration since the statute was designed to protect FDIC, not Penn Square.[7]

■ Defendants' appeal to equity is also inappropriate. Section 1823(e) does not grant this court discretion to balance the equities in determining whether an oral agreement tending to diminish FDIC's interest in purchased bank assets may be enforced. Defendants are in any event presumed to know the legal consequences of their actions and that a secret agreement limiting the liability created by a guaranty signed in blank may "conceal the truth from the vigilant eyes of the bank examiners" *D'Oench,* 315 U.S. at 460, 62

S.Ct. at 680–81. It is unfortunate if they have placed their trust in persons who have abused that trust to deceive the FDIC, but equity does not require that the wholly innocent Corporate FDIC plaintiff in this case bear the cost of that deception rather than those who enabled the deception to occur.

Defendants' attempt to read *Gunter v. Hutcheson,* 674 F.2d 862 (11th Cir.1982) as representative of a body of case law reading into § 1823(e) a requirement that obligations be purchased by FDIC without any knowledge of claims that the obligations are invalid and unenforceable possesses no merit whatsoever. *Gunter* is in the first place a unique case upon its facts, and stands as an *expansion* of federal common law protection of the FDIC, rather than as a *limitation* of the protections provided by the plain language of § 1823(e). The crux of the fraud claims brought by William L. and Camille S. Gunter in that case lay in alleged misrepresentations of *existing* fact (e.g. that a particular banking system was in "sound financial condition") made to induce an investment, rather than in breached unwritten promises of future performance. 674 F.2d at 867. FDIC had in fact, for purposes of a summary judgment motion, conceded that the Gunters were actually defrauded. Under those circumstances the court found that the action was not based on an attempt to enforce an oral side argument, and therefore that § 1823(e) did not apply. The court nonetheless adopted a *new* rule of federal common law holding that

The FDIC has a complete defense to state and common law fraud claims on a note acquired by the FDIC in the execution of a purchase and assumption trans-

consideration distinct from that of the original obligation.

**7.** The essence of consideration is, in any event, legal detriment, not reliance. *See* J. Calamari & J. Perillo, *Contracts* § 4–1 (1977). By signing the guaranty Alexander promised to do something he was not legally obligated to do, and that promise was itself consideration. Further, it is not disputed that *Alexander* received legal consideration for his promise. The face of the

guaranty in question provides that it is "for the purpose of enabling J.P. Exploration, Inc., to obtain credit or other financial accommodations from" Penn Square, and both Alexander and Jenkins concede in their briefs that they did in fact give their guaranties in order to induce Penn Square to extend credit to J.P. Exploration, albeit not in the amounts actually given. There is no question that the bargained for credit was actually extended.

action, for value, in good faith, and without actual knowledge of the fraud at the time the FDIC entered into the purchase and assumption agreement.

674 F.2d at 873. This new rule was applied to shield FDIC from the Gunters' claims even though § 1823(e) itself provided no protection. *Gunter* cannot reasonably be understood as holding that the protection afforded by § 1823(e) is not available when FDIC has knowledge of claims based on oral side agreements at the time it purchases the obligations those side agreements are alleged to nullify or modify. Indeed, such a holding would have no basis whatsoever in the clear and unambiguous language of the statute and would thwart Congress' obvious intent.

The defendants' attempt to distinguish this case from *Federal Deposit Ins. Corp. v. Investors Associate X.*, 775 F.2d 152 (6th Cir.1985), and *Federal Deposit Ins. Corp. v. Van Laanen*, 769 F.2d 666 (10th Cir. 1985), and *D'Oench* is also without merit. Defendants' response to Corporate FDIC's motion states, on page 14

> Alexander and Jenkins do not assert any simultaneous, fraudulent agreement that they would not be held liable on their respective guaranties. Nor do the material alteration defenses of Alexander and Jenkins originate from a secret agreement or transaction, but rather from the subsequent, unilateral, and fraudulent conduct of Penn Square or the FDIC as receiver of Penn Square (the "Receiver"). The guaranty documents held by the FDIC in this case appear as they do solely as a result of the subsequent wrongful acts of Penn Square or the Receiver.

These statements are simply false given the defendants' own account of the facts of this case. If every allegation of an oral, unrecorded agreement with Pinder or Patterson was deleted from the defendants' statement of facts, one would have to conclude that they have indeed alleged nothing at all in opposition to Corporate FDIC's suit on their guaranties. Defendants' own briefs repeatedly argue that statements made by Patterson constituted agreements binding on Penn Square. Although defendants' attempt to reconstrue their own allegations to focus on alleged "subsequent, unilateral, and fraudulent conduct of Penn Square or" Receiver FDIC, it is obvious that the only possible basis for finding such misconduct would be the oral agreements regarding the completion of the guaranties which defendants allege Penn Square or Receiver FDIC violated. *See Federal Deposit Ins. Corp. v. Powers*, discussed *supra*. This case is solidly within the scope of the holding in *Investors Associates X.* where the defendant Turner alleged that a bank's chief executive officer had filled in two promissory notes signed in blank by Turner in a manner that made Turner liable for $140,000 more than the $750,000 the bank officer had promised.

Perhaps defendants are arguing that they did not intend or anticipate that they were committing fraud upon anyone when they signed their blank guaranties. However, *Investors Associates X.* clearly endorsed the *D'Oench* court's statements to the effect that fraudulent intent was not relevant to its holding and held that "the only relevant inquiry in determining if a maker of a note is estopped from asserting a defense under *D'Oench* is whether he lent himself to a transaction which is likely to mislead banking authorities." 775 F.2d at 154. The delivery of a guaranty signed in blank to Penn Square officials is just such a transaction, and defendants' attempts to place all of the blame for the present appearance of their guaranties on alleged subsequent acts of Penn Square or Receiver FDIC are transparent, since it is obvious that the documents would not exist at all but for the defendants' decision to sign them in blank in the first place, thus giving others the *ability* to mislead by completing the forms improperly. It should be noted also that the existence *vel non* of fraudulent intent or knowledge of fraud is even more clearly irrelevant under the language of § 1823(e).

Lastly, defendants would in fact be well advised to pay special attention to the Tenth Circuit opinion in *Van Laanen*,

where an attempt to argue the inapplicability of the doctrine of *D'Oench* in § 1823(e) was found to be "legally frivolous" prompting the court to assess the appellant double the costs of the appeal and $500 in attorney's fees. 769 F.2d at 667. The defendants' arguments in this case are likewise frivolous and contrary to the obvious weight of the authorities. Under the circumstances, however, since the notes sued upon themselves include a generous provision for attorney's fees and costs of collection, the court does not feel additional sanctions to be necessary.

An appropriate judgment will enter.

### JUDGMENT AND ORDER

In accordance with the memorandum opinion filed herein this day,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the plaintiff, Federal Deposit Insurance Corporation, in its corporate capacity, a corporate agency of the United States, have judgment as to liability on its complaint against the defendants Bob Alexander and William A. Jenkins.

IT IS FURTHER ORDERED that the motion for summary judgment filed by the defendant Bob Alexander against the plaintiff Federal Deposit Insurance Corporation, in its corporate capacity, a corporate agency of the United States, is DENIED.

IT IS FURTHER ORDERED that the third-party complaint of Bob Alexander against the Federal Deposit Insurance Corporation, as Receiver of Penn Square Bank, N.A. be dismissed for lack of jurisdiction of the subject matter.

IT IS FURTHER ORDERED that this matter is set for hearing on the 15th day of January, 1986, in the Fifth Floor Courtroom No. 5409 at 10:00 a.m. for a determination of the actual amounts due under the notes and guaranties in question including principal, interest and costs of collection, including attorneys' fees.

IT IS FURTHER ORDERED that the plaintiff Federal Deposit Insurance Corporation, in its corporate capacity, a corporate agency of the United States, appear and show cause on the 15th day of January, 1986, in the Fifth Floor Courtroom No. 5409 at 10:00 a.m. why its complaint against Charles E. Carter should not be dismissed for failure to make service of the summons and complaint within the 120 day period provided by Federal Rule of Civil Procedure 4(j).

### STIPULATION

The plaintiff, Federal Deposit Insurance Corporation, in its corporate capacity, a corporate agency of the United States, and the defendants, Bob Alexander and William A. Jenkins, by and through their respective attorneys, for purposes of the hearing scheduled herein on January 15, 1986, hereby agree and stipulate as follows:

1. The principal amount due under the notes and guaranties in question as of January 15, 1986 is $7,139,025.22.

2. The accumulated interest due and unpaid under the notes and guaranties in question as of January 15, 1986 is $3,083,-605.96.

3. The total for principal and interest due as of January 15, 1986 is $10,222,-631.18.

4. Per diem interest accrues at the rate of $2,249.26 per day from January 15, 1986 until paid.

5. The parties stipulate and agree that the only matter left for the Court to rule on at the hearing on January 15, 1986 is the question of attorney's fees.

6. The parties further agree and stipulate that the Journal Entry of Judgment against defendant Bob Alexander, when signed by the Court, once the Court has determined attorneys' fees, may be held by the attorneys for plaintiff and not filed, if ever, until such time as the parties conclude that they cannot reach an amicable settlement of the disputes involved in this action.

7. The parties hereby request that the judgment to be entered with respect to liability and damages be certified by the

Court as final and appealable pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, a corporate agency of the United States

By: /s/ Jimmy Goodman

JIMMY GOODMAN

CROWE & DUNLEVY

1800 Mid-America Tower

20 North Broadway

Oklahoma City, OK 73102

(405) 235–7700

One of Its Attorneys of Record

BOB ALEXANDER and

WILLIAM A. JENKINS

By: /s/ Michael E. Joseph

MICHAEL E. JOSEPH

W. CHRIS COLEMAN

Tenth Floor, Two Leadership Square

Oklahoma City, OK 73102

(405) 235–9621

Their Attorneys of Record