**FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver for Indian Springs State Bank, Plaintiff,**

v.

**Edward Michael BERR, Defendant.**

Civ. A. No. 83–2461.

United States District Court, D. Kansas.

Aug. 29, 1986.

Michael C. Manning, Marc E. Elkins, Morrison, Hecker, Curtis, Kuder & Parrish, Overland Park, Kan., Christopher A. Byrne, Office of Gen. Counsel, Federal Deposit Ins. Corp., Washington, D.C., for plaintiff.

Susan Ellmaker, Overland Park, Kan., Steven M. Dickson, Dickson & Pope, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter arises out of the failure of Indian Springs State Bank ["ISSB"] and the subsequent appointment of the Federal Deposit Insurance Corporation ["FDIC"] as receiver for the bank. Pending before the court are two motions filed by plaintiff FDIC. The first is a motion for leave to file an amended complaint. The other is a motion for summary judgment against defendant Edward Michael Berr on Count I of the original complaint. For the following reasons, we shall grant both motions.

### I. *Motion to Amend.*

We first turn our attention to plaintiff's motion for leave to file an amended complaint. The original complaint consists of one count, in which the FDIC alleges that defendant is in default on a promissory note that he executed and which was made payable to ISSB. The proposed amended complaint would add a second count alleging fraud in connection with the loan transaction between defendant and ISSB and would seek actual and punitive damages.

Motions to amend are governed by Federal Rule of Civil Procedure 15(a). Rule 15(a) clearly states that leave to amend "shall be freely given when justice so requires," and the Supreme Court has warned that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). A trial court has wide discretion to grant such a motion. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971).

■ In the absence of a specific factor such as flagrant abuse, bad faith, or truly inordinate and unexplained delay, prejudice to the opposing party is the key factor to be evaluated in deciding a motion to amend. *Miller v. Mutual of Omaha*, No. 74–214–C5 (D. Kan., *unpublished,* 10/4/76). Prejudice under Rule 15 "means undue difficulty in prosecuting or defending a lawsuit as a result of a change of tactics or theories on the part of the other party." *Deakyne v. Commissioners of Lewes*, 416 F.2d 290, 300 (3d Cir.1969). The party opposing the amendment of the pleadings has the burden of showing prejudice. *Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 540 (8th Cir.1977).

■ Defendant has not responded to the FDIC's motion to amend. Thus, he has not, of course, met his burden of demonstrating prejudice from the opposed amendments. Moreover, we are persuaded that, even if he had responded, he could not have satisfied that burden. The FDIC's proposed amendments stem from information that it uncovered during the course of discovery. That information, the FDIC alleges, reveals that Berr "made a number of material representations to ISSB in connection with his loan application to ISSB and the promissory note." Memorandum in Support of Plaintiff's Motion for Leave to Amend, at 2.

Thus, the FDIC's proposed amendments relate to claims arising from the same transaction or occurrence that forms the basis of its original complaint. Moreover, because the FDIC became aware of the existence of the new claim only after extensive discovery, there is no indication that the FDIC inordinately delayed in seeking amendment of the complaint. *See, e.g., Holt v. Katy Industries, Inc.*, 71 F.R.D. 424, 427 (S.D.N.Y.1976). Similarly, there is no evidence of bad faith or dilatory motive. Finally, because defendant has had access to at least the same information now available to the FDIC, he will not be unduly prejudiced by having to defend against this new count. We shall, therefore, grant plaintiff's motion for leave to amend its complaint.[1]

## II. *FDIC's Motion for Summary Judgment.*

Also pending before the court is the FDIC's motion for summary judgment on Count I.[2] We conclude that summary judgment should be granted on that count.

The legal standards to be applied to summary judgment motions are well established. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering such a motion, the court must examine all evidence in the light most favorable to the

---

1. We note that plaintiff's proposed amendment may be futile. In *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653 (1984), the Kansas Supreme Court held that a plaintiff may recover punitive damages in a contract action only upon a showing that an *independent tort* resulted in *additional damages. Id.* at 592–94, 682 P.2d at 663–64. We leave undecided the questions of whether that rule applies to this case and whether plaintiff has alleged an independent tort that resulted in additional dam-

ages. The parties have not briefed either question and we hesitate to decide them without guidance from the litigants.

2. Plaintiff's motion for summary judgment on Count I was filed before it filed its motion to amend. Because we have decided to grant plaintiff leave to file an amended complaint, we shall hereinafter refer to the first count as Count I of plaintiff's amended complaint.

opposing party. *Mogle v. Sevier County School District*, 540 F.2d 478, 482 (10th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1976). Moreover, summary judgment must be denied unless the moving party demonstrates its entitlement to it beyond a reasonable doubt. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027 (10th Cir.1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33 (10th Cir.1975).

### A. *Facts.*

The following facts, which have been gleaned from the statements of fact submitted by the parties, are either undisputed or are stated in the light most favorable to defendant.

In the spring of 1982, Sam Daily, Franklin Winkler, Fred Figge, and their related business entities were in default or delinquent on various loans. The loans were secured by real estate that was owned by these individuals and their businesses. To help pay the indebtedness on the real estate, Daily, Winkler, and Figge devised a scheme whereby they would form limited partnerships, which would then purchase the real estate from them at greater than market prices. Toward that end, the three men formed two limited partnerships, Haiku Holdings and Haiku Partners. Daily, Winkler, and Figge served as the general partners of the partnerships.

The general partners met with William LeMaster and Anthony Russo, President and Vice President of ISSB, respectively, to discuss financing for the scheme. The general partners promised to refer investors to ISSB to apply for loans of up to $100,-000.00 each at a specified interest rate. The investors were to use the loans to purchase interests in the limited partnerships. The parties agreed that the loans would be repaid out of profits from the partnerships and not from the personal funds of the individual borrowers. Moreover, if the Haiku partnerships did not generate sufficient profits to pay off the notes within one year, the notes were to be "rolled-over" for an additional two years.

The general partners promised ISSB that they would arrange to have funds deposited with ISSB in a two-to-one ratio of deposits to loans. The deposited funds were to come from First United Fund, a money brokerage firm (which, incidentally, is itself the subject of the FDIC's scrutiny).

The general partners were able to persuade at least forty individuals to obtain loans from ISSB. The total amount of the loans was nearly $3,000,000.00.

Defendant was one of the individuals who was contacted by the general partners. They persuaded him to execute a note, payable to ISSB, in the amount of $100,-000.00. Defendant used the proceeds to purchase interests in the limited partnerships. Defendant also executed both a security agreement, which granted ISSB a security interest in defendant's interest in the partnerships, and a financing statement.

To induce defendant to sign the note, Sam Daily and William LeMaster orally represented to him that he would not be personally liable on the note. In addition, Daily stated that the note would be "rolledover" for up to three years. Defendant also alleges that LeMaster, Russo, and the general partners made other misrepresentations, including statements regarding the solvency and profitability of the limited partnerships.

Beginning approximately in November of 1982, the FDIC began a three-month investigation of ISSB. During the course of the investigation, the FDIC specifically examined all of the Haiku-related loans. The FDIC criticized the bank's participation in financing the purchase of the Haiku limited partnerships and informed ISSB that the loans were improper because they were all related to one project and, therefore, exceeded ISSB's loan limitations to an individual entity. Eventually, the FDIC classified the loans as "uncollectible," and required ISSB to write them off its books.

On January 27, 1984, the Kansas State Bank Commissioner determined that ISSB was insolvent. The bank commissioner or-

dered ISSB closed and the FDIC accepted appointment as receiver of the bank. Under Kansas law, the FDIC, as receiver of ISSB, is the owner and holder of all ISSB assets, including those assets evidenced by the note and security agreement in controversy here. *See* K.S.A. 9–1905.

Absent any defense, defendant is now in default on the note and there is a balance due of $100,000.00 plus interest at the rate of 16 percent per annum. Defendant has refused plaintiff's demand for payment of the indebtedness.

### B. *Analysis.*

It is undisputed that defendant executed the note in question, which on its face indicates that he is personally liable to the holder of the note in the amount of $100,-000.00. As a defense, defendant asserts that he obtained the loan, and executed the note, pursuant to oral representations made by Sam Daily and William LeMaster that he would not be personally liable on the note and that it would be rolled-over for three years. Defendant, in effect, is asking the court to enforce those terms against the FDIC. Defendant also asserts the affirmative defenses of fraudulent inducement and promissory estoppel, based on those and other misrepresentations allegedly made by LeMaster and the general partners. As the FDIC correctly notes, however, none of the defenses that defendant has asserted is effective against the FDIC.

In support of its argument that defendant is barred from asserting his defenses, the FDIC relies on the *D'Oench* doctrine, first enunciated by the Supreme Court in *D'Oench, Duhme and Company, Inc. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. .676, 86 L.Ed. 956 (1942).[3] Under that doctrine, the maker of a note may not plead various defenses against the FDIC, if in executing the note he lent himself to a scheme that would tend to mislead the banking authorities. *Id.* at 458–60, 62 S.Ct. at 679–680. The *D'Oench* doctrine is based on "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [it] insures or to which it makes loans." *Id.* at 457, 62 S.Ct. at 679.

Defendant admits that the note was carried on the books of ISSB as a real asset. *Cf. F.D.I.C. v. Van Laanen*, 769 F.2d 666, 667 (10th Cir.1985). Moreover, there is no genuine dispute that the note was generated as part of a scheme to evade lending requirements, which limit the amount that a bank may loan to a single individual or entity. Nonetheless, defendant insists that the *D'Oench* rule does not apply here.

Defendant notes that this court has cited a four-pronged test to determine whether *D'Oench* applies. In *F.D.I.C. v. Vestring*, 620 F.Supp. 1271 (D.Kan.1985), we borrowed language from a decision by the Western District of Oklahoma, which set out four elements of the *D'Oench* doctrine: "(1) the FDIC must be the party against whom the claim or defense is asserted, and (2) the party asserting the claim or defense must have lent himself (3) to a secret agreement (4) that deceived or would tend to deceive the FDIC." *Id.* at 1273 (quoting *In Re Longhorn Securities Litigation*, 573 F.Supp. 278, 280–81 (W.D.Okla.1983)). Defendant's position is that the FDIC cannot establish several of these elements.

First, defendant maintains that the FDIC has no proof that he *intended* any collateral agreement with ISSB to be a secret.

---

**3.** Generally, the FDIC has two other doctrines by which it can defeat affirmative defenses raised by makers of commercial paper. First, the FDIC often may be able to claim holder in due course status as to notes and other negotiable instruments that it holds. Here, however, a factual dispute exists as to whether the FDIC had actual notice of the alleged fraudulent inducement, which, if proven, would deprive the FDIC of such status. *See F.D.I.C. v. Vestring*, 620 F.Supp. 1271, 1273 (D.Kan.1985). Thus, the FDIC does not rely on that doctrine in its motion for summary judgment. Second, the FDIC, if suing in its corporate capacity, may rely on 12 U.S.C. § 1823(e) to prevent a maker from asserting a secret, side agreement that "tends to diminish or defeat" the terms of the paper. Because the FDIC is suing in its receivership, rather than corporate, capacity, that statutory provision is not available to the FDIC.

The FDIC, however, need make no such showing. As the court in *D'Oench* stated, the rule applies even if the defendant had "no positive idea of committing any fraud upon any one." 315 U.S. at 458, 62 S.Ct. at 680. In fact, the court emphasized that, if the maker lent himself to the scheme, he would be liable on the note even if he was *ignorant* of it. *Id.* at 461, 62 S.Ct. at 681. *See also F.D.I.C. v. First National Finance Co.*, 587 F.2d 1009, 1012 (9th Cir. 1978); *Vestring*, 620 F.Supp. at 1273–74.

■ Second, defendant contends that no "agreement" is involved here. Rather, defendant characterizes his understanding that he would not be personally liable on the note and that it would be rolled-over for three years as "representations" made by ISSB. Citing *In re Longhorn*, defendant insists that *D'Oench* bars only the assertion of side "agreements" that are contrary to the face of the note, not mere "representations" that alter the note. We cannot agree.

Defendant makes too much of our use of the *In re Longhorn* court's four-prong test, which mentions agreements but not representations. Clearly, the *D'Oench* doctrine applies to bar side agreements, and thus the test is correctly applied to cases in which a maker attempts to assert such agreements against the FDIC. But we have never held, nor do we here, that the *D'Oench* rule is limited to such cases.

We note that the *D'Oench* doctrine protects the FDIC from deceptive schemes or arrangements to which a defendant has lent himself. The important thing is that the FDIC be protected from such deceptive schemes. It makes no difference whether the particular scheme is carried out through secret, side agreements or misrepresentations. So long as the maker of the note lent himself to the scheme, the federal common law protects the FDIC.

In any event, we also disagree with defendant's characterization of the three-year roll-over and no personal liability provisions as representations, rather than agreements. Defendant cites the *In re Longhorn* decision, which defined an agreement

as "a concord of understanding and an intention between two or more parties with respect to the effect upon their relative rights and duties, of certain past or future acts or performances." 573 F.Supp. at 282 (quoting *Black's Law Dictionary* 62 (5th Ed.1979)). Without question, the provisions in question fall within this definition.

Defendant's defense is essentially that, notwithstanding the facial terms of the note, he had an understanding with the bank that he would not be personally liable on the note. Because he thus insists that the understanding orally reached by the parties directly affects his duty to pay, that "understanding" falls within defendant's own definition of an agreement. Hence, his attempt to avoid the *D'Oench* doctrine through, in the FDIC's words, "semantic alteration," is unpersuasive.

Defendant's third argument is that a material issue of fact exists with regard to the fourth element necessary for application of *D'Oench* estoppel: that the scheme "deceived or would tend to deceive the FDIC." *In re Longhorn*, 573 F.Supp. at 281. Defendant notes that there is some indication that the FDIC may have known about the scheme long before ISSB failed and the FDIC became its receiver.

The Sixth Circuit, in *F.D.I.C. v. Investors Associates X., Ltd.*, 775 F.2d 152 (1985), recently addressed the precise question that defendant's argument poses. There, the court held that the FDIC's knowledge of the fraudulent scheme does not preclude application of *D'Oench* and its progeny. In so holding, the court persuasively remarked that:

> *D'Oench* is essentially premised upon the proposition that a wrongdoer or one who lends himself to aid a fraudulent scheme should not be able to defend his actions based upon events emanating out of a transaction which violates public policy. *D'Oench*, 315 U.S. at 459, 62 S.Ct. at 680 ("it is the 'evil tendency' of the acts to contravene the policy governing banking transactions which lies at the root of the rule") [citation omitted]. Thus, the focus

in applying *D'Oench* is upon the fact that the maker's defense arises out of a fraudulent transaction and not upon the knowledge of the FDIC. Regardless of the FDIC's knowledge of the circumstances surrounding the transaction, the fraudulent scheme is still contrary to public policy and the wrongdoer still should not be able to benefit from something that transpired during the course of such a scheme.

*Id.* at 155–56. Other courts are in accord, *see, e.g., F.D.I.C. v. de Jesus Velez,* 514 F.Supp. 829, 834 (D.P.R.1981), *aff'd,* 678 F.2d 371 (1st Cir.1982), and the same result is reached in cases applying section 1823(e). *See, e.g., F.D.I.C. v. Merchants National Bank of Mobile,* 725 F.2d 634, 640 (11th Cir.1982) (knowledge of FDIC irrelevant).

In addition, one need not focus, as the Sixth Circuit did, on the proposition that a wrongdoer should not be allowed to benefit from something that occurred as part of a fraudulent scheme to conclude that *D'Oench* applies regardless of the FDIC's knowledge of the scheme. In *D'Oench,* the Supreme Court stated that "[t]he test is whether the note was designed to deceive the creditors or the public authority, or *would tend to have that effect."* 315 U.S. at 460, 62 S.Ct. at 681 (emphasis added). By stating that the scheme need only "tend" to be deceptive, the Court made it clear that actual deception is not required. That holding makes sense, not only because it prevents a defendant from benefiting from a scheme to which he at least lent himself, but also because it promotes the policy of protecting the FDIC. Others who are tempted to sign notes with secret, side agreements or otherwise lend themselves to deceptive transactions will be best deterred from such conduct if the federal common law condemns the practice, whether the FDIC learns about the scheme before the bank collapses or not. Moreover, it would be anomalous to treat various defendants differently, depending on whether or not the FDIC learned about the scheme prior to the bank's failure, even though the defendants had similarly lent themselves to deceptive schemes.

Accordingly, we conclude that the *D'Oench* doctrine applies even if the FDIC was aware of the Haiku scheme before it was appointed receiver for ISSB. Any factual dispute over the extent of the FDIC's knowledge does not, therefore, pose a material question of fact.

Defendant's final argument is that, even if the *D'Oench* rule is applicable in the instant case, it does not preclude him from asserting all of his defenses. In particular, he argues that it does not bar his fraudulent inducement defense. Once again, we disagree.

It is true that the *D'Oench* case dealt only with the defense of failure of consideration. As the *Investors Associates* court noted, however, the rationale of the *D'Oench* case is equally applicable to other defenses:

> [T]he basis of the Court's decision was that the maker of a note should not be able to assert as a defense the very secret agreement which violated public policy. *D'Oench,* 315 U.S. at 461 [62 S.Ct. at 681]. Thus, the Court was less concerned with the particular defense presented by that case, failure of consideration, than with the fact that the maker's defense originated out of the secret agreement transaction.

775 F.2d at 156. *See also F.D.I.C. v. Timbalier Towing Co.,* 497 F.Supp. 912, 922 (N.D.Ohio 1980); *British Columbia Investment Co. v. F.D.I.C.,* 420 F.Supp. 1217, 1224 (S.D.Cal.1976). We again concur with the Sixth Circuit and conclude that *D'Oench* estops a maker from asserting any defense, including fraudulent inducement, that arises out of the deceptive scheme or arrangement.

■ In sum, then, because all of defendant's defenses have their origin in the deceptive scheme, he is estopped from asserting those defenses. Since it is undisputed that defendant executed the note and that the note is now in default, a full trial is unnecessary. Accordingly, the court shall grant plaintiff FDIC's motion for summary

judgment on Count I of its amended complaint.

IT IS THEREFORE ORDERED that plaintiff FDIC's motion for leave to file an amended complaint is hereby granted.

IT IS FURTHER ORDERED that plaintiff FDIC's motion for summary judgment on Count I of its amended complaint is also hereby granted.