In re Edward M. BERR, Debtor.

Edward M. BERR, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Appellee.

BAP No. EC–93–1436–RVJ.
Bankruptcy No. 90–25580–C–7.
Adv. No. 90–2458.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Jan. 20, 1994.

Decided Sept. 14, 1994.

Roy L. Anderson, Honolulu, HI, for appellant.

Gary T. Lafayette, San Francisco, CA, for appellee.

Before RUSSELL, VOLINN and JONES, Bankruptcy Judges.

### OPINION

RUSSELL, Bankruptcy Judge:

The Federal Deposit Insurance Corporation ("FDIC"), as successor-in-interest, filed a complaint to determine the nondischargeability of debt pursuant to 11 U.S.C. §§ 523(a)(2)(A)[1] and 523(a)(2)(B) of the Bankruptcy Code. The bankruptcy court determined that the debt owing to the FDIC was nondischargeable under § 523(a)(2)(B) since it had reasonably relied on a materially false financial statement. The debtor appeals. We REVERSE and REMAND.

## I. FACTS

The debtor, Edward Berr ("Berr") was a resident of Hawaii. Berr had worked hard in the real estate business, having obtained a MBA degree, a real estate sales license, and a real estate broker's license all before the age of 30. Berr was employed by Sam Daily Realty on the island of Oahu. The owner of Sam Daily Realty was Sam Daily ("Daily"), whom Berr referred to as his "mentor."

### 1. A Scheme is Born

In the spring of 1982, Daily, Franklin Winkler ("Winkler"), Fred Figge ("Figge"), and their related business entities were in default or delinquent on various loans. The loans were secured by real estate owned by these individuals and their businesses. Approximately $3 million was necessary to cure arrearages and reinstate the mortgages in default. To help pay the indebtedness on the

real estate, Daily, Winkler, and Figge devised a scheme whereby they would form limited partnerships, which would then purchase the real estate from them at greater than market prices. Toward that end, the three men formed two limited partnerships, Haiku Holdings and Haiku Partners. Daily, Winkler, and Figge served as the general partners of both partnerships.

The most extraordinary feature of the limited partnerships was that none of the limited partners invested a dime of his or her own money; all of it was to be borrowed from Indian Springs State Bank ("ISSB"), a very small, unsophisticated bank operating in a single location in a Kansas City area shopping center. The general partners met with William LeMaster ("LeMaster") and Anthony Russo ("Russo"), President and Vice President of ISSB, respectively, to discuss financing for the scheme. The general partners promised to refer investors to ISSB to apply for loans of up to $100,000 each at a specified interest rate subsequently determined to be 16%. The investors were to use the loans to purchase interests in the limited partnerships. Although it was contemplated that the loans would be repaid out of profits from the partnerships and not from the personal funds of the individual borrowers, each note clearly indicated that the loan would be a full recourse loan and that each borrower would be personally liable for repayment. Moreover, it was anticipated that if the Haiku partnerships did not generate sufficient profits to pay off the notes within one year, the notes were to be "rolled-over" for an additional two years.

The limited partner format was necessary because ISSB could not simply loan the partnership the $3 million; ISSB was subject to regulations limiting loans for an individual or out-of-state entity to $100,000 each. In effect, the Haiku Holdings and Haiku Partners partnerships were going to use the investors' personal financial statements to obtain a $3 million loan for the partnership.

### 2. The Recruiting of the Investors

Daily, Winkler, and Figge worked together to develop a private placement memorandum

---

**1.** Unless otherwise indicated, all chapter, section and Rule references are to the Bankruptcy Code,

11 U.S.C. §§ 101–1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

("PPM"), an investor's disclosure document, to raise the $3 million they needed. A series of meetings were set up to recruit investors under the PPM. Daily was the principal salesman at these meetings. The pitch: investors would split $600,000 in tax benefits, due to depreciation of $400,000 and negative cash flow of $200,000 per year.[2]

To induce their participation, investors were allegedly told by the general partners that: (1) the applications for the loans were a mere formality and would not be scrutinized by the bank and that all debts need not be listed on the applications; (2) the partnerships would make all the loan payments and the investors would have no personal liability; (3) condominiums, which could be sold in short order, would be transferred to one of the partnerships; (4) there were adequate reserves set aside to offset any negative cash flow; and (5) investors would not be required to make any further contributions. In some instances, investors were told by Daily, Winkler and Figge to beef up their applications by adding false statements. In other cases, the general partners altered or completed the applications such that they evidenced material falsehoods without investors' knowledge.

The loan proceeds were then directly deposited into the Haiku Holdings' and Haiku Partners' account by ISSB; the borrowers never saw the money. In exchange for their deposit, the investors received a limited partnership interest in Haiku Holdings and/or Haiku Partners. Those partnership interests were then pledged to the bank as security for the loans.

The general partners were able to persuade at least forty individuals to obtain

loans from ISSB.[3] The total of the loans was nearly $3 million.

### 3. *The Recruiting of Berr*

The relationship between Daily and Berr was close. Berr was one of Daily's best real estate salespersons. They had extensive interaction on both a business and personal basis.

Berr was one of the individuals who was personally contacted by Daily and the general partners during the initial solicitations in July 1982. Apparently, Berr was somewhat of a procrastinator when it came to investment decisions.

The initial loans to limited partners were funded in July 1982. Berr was one of the last investors to invest. He finally committed to the partnership in September 1982.

On September 3, 1982, Berr executed a credit application, financial statement, list of references and letter to ISSB to obtain the $100,000 loan. Once his application for credit was approved, Berr used the proceeds to purchase interests in the limited partnerships. Berr also executed a security agreement, which granted ISSB a security interest in Berr's interest in the partnerships.

The FDIC has claimed that the information on the financial statement and credit application submitted by Berr to ISSB was materially false, misleading and contained inflated values of his real property. The bankruptcy court concluded that Berr had made three material misrepresentations in the financial statement and credit application. First, Berr understated his income by falsely representing his actual income. Second, Berr failed to list a property he owned.

---

2. For more on the sales meetings and recruiting investors, *see In re Figge*, 94 B.R. 654, 659–60 (Bankr.C.D.Cal.1988), *aff'd mem.*, 928 F.2d 1136 (9th Cir.1991).

3. There have been several published opinions concerning the Haiku transactions. *Fed. Deposit Ins. Corp. v. Berr*, 643 F.Supp. 357 (D.Kan.1986) (Edward Berr—debtor in this appeal); *In re Figge*, 94 B.R. 654 (Bankr.C.D.Cal.1988) (Figge was a general partner), *aff'd mem.*, 928 F.2d 1136 (9th Cir.1991); *In re Chessen*, 71 B.R. 169 (Bankr.D.Haw.1987) (Peter Chessen—limited

partner); *In re Burkhart*, 84 B.R. 658 (9th Cir. BAP 1988) (Eugene and June Burkhart—limited partners); *In re Brenesell*, 109 B.R. 412 (Bankr. D.Haw.1989) (Michael Brenesell—limited partner); *In re Daily*, 124 B.R. 325 (Bankr.D.Haw. 1991) (wife of Sam Daily); *United States v. Daily*, 921 F.2d 994 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991) (appeal of Daily and Figge's criminal conviction for conspiring to commit wire fraud and submitting false statements as to matters within the jurisdiction of a federal agency).

Third, Berr improperly valued property which he owned.

Berr alleged that Daily and LeMaster orally represented to him that he would not be personally liable on the note. In addition, he alleged that Daily stated that the note would be "rolled-over" for up to three years. Berr also alleged that LeMaster, Russo, and the general partners made other misrepresentations, including statements regarding the solvency and profitability of the limited partnerships.

### 4. *The Scheme Begins to Unravel*

Beginning approximately in November of 1982, the FDIC began a three-month investigation of ISSB. During the course of the investigation, the FDIC specifically examined all of the Haiku-related loans. The FDIC criticized the bank's participation in financing the purchase of the Haiku limited partnership and informed ISSB that the loans were improper. Eventually, the FDIC classified the loans as "uncollectible," and required ISSB to write them off its books.

On May 3, 1983, Berr was contacted by LeMaster by a letter informing the borrowers that when the loans become due, the entire principal plus interest would be due as a result of the FDIC investigation. On August 16, 1983, another letter was sent to Berr by an attorney representing ISSB informing Berr that the loan was now due and payable as a result of a default provision in the security agreement arising from a missed interest payment.

On December 13, 1983, ISSB filed a complaint in the United States District Court for the District of Kansas seeking to recover on the note executed by Berr ("Kansas litigation").

### 5. *The FDIC as Receiver of ISSB*

On January 27, 1984, ISSB was declared insolvent by the Kansas State Bank Commissioner. The FDIC became the successor-in-interest to the Kansas litigation.

In 1986, the FDIC amended its complaint to allege that Berr had committed fraud in obtaining the loan. Sometime in 1986, summary judgment was granted in favor of the FDIC as to the contractual liability claim. Thereafter, the FDIC and Berr agreed to stipulate to a dismissal with prejudice of all claims pending in the Kansas litigation in return for an agreed upon judgment. On June 30, 1989, a judgment was entered against Berr and in favor of the FDIC for the sum of $100,000 with interest of $47,-824.60 and interest accruing at the rate of $43.84 per day commencing September 11, 1985, until paid.

On August 28, 1990, Berr filed a Chapter 7 petition. On December 4, 1990, the FDIC filed a complaint to determine the dischargeability of Berr's debt pursuant to §§ 523(a)(2)(A) & (B). After an eight day trial, the bankruptcy court entered a final judgment on March 31, 1993, declaring the obligation to be nondischargeable under § 523(a)(2)(B). Berr timely filed his notice of appeal on April 8, 1993.

## II. ISSUES

1. Whether a stipulated judgment agreed upon by the parties was intended to have preclusive effect so as to collaterally estop the relitigation of fraud pursuant to § 523(a)(2)(B).

2. Whether the bankruptcy court erred in finding that the debt owed to the FDIC was nondischargeable under § 523(a)(2)(B).

## III. STANDARD OF REVIEW

We review the bankruptcy court's findings of fact under the clearly erroneous standard, and its conclusions of law *de novo*. *In re Siriani*, 967 F.2d 302, 303–04 (9th Cir.1992).

■ Determinations by the bankruptcy court on questions regarding the availability of collateral estoppel are reviewed *de novo*. *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1320 (9th Cir.1992).

■ The issue of dischargeability of debt is a question of federal law, not state law and is governed by the provisions of the Bankruptcy Code. *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 657–58, 112 L.Ed.2d 755 (1991). Whether the misrepresentations were material under the circum-

stances, whether there was reasonable reliance, and whether there was intent to deceive are issues of fact reviewable under the clearly erroneous standard. *In re Lansford,* 822 F.2d 902, 904 (9th Cir.1987); *In re Kirsh,* 973 F.2d 1454, 1456 (9th Cir.1992).

## IV. DISCUSSION

### 1. *Collateral Estoppel*

The FDIC argues that under Ninth Circuit authority, in a case such as this, principles of collateral estoppel do not preclude a creditor from introducing evidence in a dischargeability action to establish a defendant's fraudulent conduct. *In re Daley,* 776 F.2d 834 (9th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

*Daley* involved a prior bankruptcy court proceeding between a debtor and a creditor in which the initial complaint had alleged twenty-one counts of breach of contract and fraud. The prior proceeding resulted in a stipulated dismissal with prejudice of the fraud claims. The Ninth Circuit held that collateral estoppel did not apply since the bankruptcy court has the exclusive jurisdiction to determine dischargeability, and thus must consider all relevant evidence bearing on the nature of the debt. *Daley* at 838–39.

The decision of *Daley* relied on another Ninth Circuit case, *In re Houtman,* 568 F.2d 651 (9th Cir.1978). In *Houtman,* the Ninth Circuit stated:

[t]he 1970 Amendments to the Bankruptcy Act imposed upon the bankruptcy courts the exclusive jurisdiction to determine dischargeability. As we read those Amendments *there is no room for the application of the technical doctrine of collateral estoppel in determining the nondischargeability of debts* described in section 17(a)(2), (4), and (8) of the Bankruptcy Act.

*Id.* at 653 (emphasis added).

In 1991, the Supreme Court overruled both *Houtman* and *Daley* as to their interpretation on the availability of collateral estoppel in nondischargeability proceedings. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Supreme Court in *Grogan* stated:

Our prior cases have suggested, but have not formally held, that the principles of collateral estoppel apply in bankruptcy proceedings under the current Bankruptcy Code.... Virtually every Court of Appeals has concluded that collateral estoppel is applicable in discharge exception proceedings.... *We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).*

*Grogan,* 498 U.S. at 284–85 n. 11, 111 S.Ct. at 658 n. 11 (citations omitted) (emphasis added).

 In applying collateral estoppel, we apply federal law to determine the preclusive effect[4] of a prior federal[5] diversity judg-

---

**4.** As used in this opinion, "collateral estoppel" is synonymous with the concept of "issue preclusion", which treats as final only those questions actually and necessarily decided in a prior suit. *Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979). *See also* Austin W. Scott, *Collateral Estoppel by Judgment,* 56 Harv.L.Rev. 1, 3 n. 4 (1942). This concept is to be distinguished from *"res judicata,"* or "claim preclusion." "[A] final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. U.S.,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). *Res judicata* prevents litigation of all grounds for, or defense to, recovery that was previously available to the parties, regardless of whether the grounds were asserted or determined at the prior proceeding. *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 378, 60 S.Ct. 317, 320, 84 L.Ed. 329, 335, *reh'g denied,* 309 U.S. 695, 60 S.Ct. 581, 84 L.Ed. 1035 (1940); *see generally,*

Barry Russell, *Bankruptcy Evidence Manual* §§ 1–40 (1994–95 ed.).

Because nondischargeability of a debt is an entirely separate determination with its own elements under § 523 which require more than the establishment of liability, principles of *res judicata* do not apply (i.e. no determination of nondischargeability was made). Collateral estoppel, on the other hand, would apply to individual fact determinations made by the state court that were actually litigated. *See Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

**5.** If this were a state court judgment, we would nonetheless apply federal law. Generally, 28 U.S.C. § 1738 requires that federal courts afford the same full faith and credit to a state court judgment, as would apply in that state. However, dischargeability proceedings under §§ 523(a)(2), (4) & (6) provide an exception to the applicability of § 1738. *In re Raynor,* 922 F.2d 1146, 1150 (4th Cir.1991); *In re Gottheiner,*

ment. Under the federal standard, to foreclose relitigation of an issue under collateral estoppel, four[6] elements must be met:

1) The issue sought to be precluded must be the same as that involved in the prior action;

2) The issue must have been actually litigated;

3) It must have been determined by a valid and final judgment; and

4) The determination must have been essential to the final judgment.

*Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir.1992); *Spilman v. Harley*, 656 F.2d 224, 227–28 (6th Cir.1981); *Matter of Ross*, 602 F.2d 604, 608 (3d Cir.1979).

 The party seeking to assert collateral estoppel has the burden of proving all the requisites for its application. *Spilman*, 656 F.2d at 229; *Matter of Merrill*, 594 F.2d 1064, 1067 (5th Cir.1979); *In re Spector*, 22 B.R. 226, 231 (Bankr.N.D.N.Y.1982). To sustain this burden, a party must introduce a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action. Any reasonable doubt as to what was decided by a prior judgment should be resolved against giving it collateral estoppel effect.

The doctrine of collateral estoppel serves the purpose of protecting parties from multiple lawsuits and the possibility of inconsistent decisions, and it conserves judicial resources. *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 553, 110 S.Ct. 1331, 1337, 108 L.Ed.2d 504 (1990); *Montana v. U.S.*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979); *Parklane Hosiery*, 439 U.S. at 326, 99 S.Ct. at 649.

 Thus, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a differ-

ent cause of action involving a party to the prior litigation. *Montana*, 440 U.S. at 153, 99 S.Ct. at 973.

### A. *Identity of Issues*

 The prior proceeding in the Kansas district court was between Berr and the FDIC. The FDIC's complaint alleged that Berr was contractually liable for the amount due and he fraudulently obtained a loan from ISSB based on material misrepresentations. The parties ultimately settled their claims and entered into a stipulated judgment. That judgment provided for the debtor's contractual liability in an agreed upon amount, and that all other claims and causes of action either asserted or which could arise from the subject matter by either party be dismissed with prejudice.

 Shortly after Berr filed his bankruptcy petition, the FDIC filed a complaint to determine dischargeability of debt under §§ 523(a)(2)(A), (B) based on similar causes of action. We hold that when the issues before the bankruptcy court do not differ from the issues which were before the prior adjudicating court, the "identity of issues" prong is satisfied.

### B. *Actually Litigated*

 Ordinarily, stipulated or consent judgments do not provide a basis for collateral estoppel. The very purpose of a stipulated or consent judgment is to avoid litigation, so the requirement of actual litigation will always be missing. However, such judgment may be given preclusive effect if that was the intent of the parties. The intent of the parties can be inferred either from the judgment or the record. *Barber v. Int'l Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Dist. Lodge No. 57*, 778 F.2d 750, 757 (11th Cir.1985).

---

703 F.2d 1136, 1140 (9th Cir.1983); *Spilman v. Harley*, 656 F.2d 224, 228 (6th Cir.1981); *Matter of McMillan*, 579 F.2d 289, 292 (3d Cir.1978).

**6.** Traditionally, there was a fifth requirement of mutuality. The mutuality requirement mandated that the same parties had to be involved in both the prior proceeding and the current proceeding. Mutuality is no longer required in most circum-

stances. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979). The continued need for the requirement of mutuality is not important in this case as appellant and appellee were both parties to the previous lawsuit and the appellant was asserting the doctrine defensively against appellee.

In *In re Halpern,* 810 F.2d 1061 (11th Cir.1987), a debtor appealed a bankruptcy court's ruling that his debt to a bank was nondischargeable based upon fraud. The Eleventh Circuit held that the bankruptcy court properly gave collateral estoppel effect to findings entered in connection with a state court consent judgment previously rendered against the debtor. The debtor had admitted that he had made material misrepresentations in order to defraud the bank, and these findings involved the same factual questions pertinent to the dischargeability issue. The court held that a consent judgment may have preclusive effect if it contains detailed findings and it was intended to finally adjudicate the disputes between the parties. *Id.* at 1064.

■ In *Klingman v. Levinson,* 831 F.2d 1292, 1293 (7th Cir.1987), a consent decree included a stipulation of facts establishing defalcation by a fiduciary, as well as a statement of the debtor's intention that the obligation not be dischargeable in any bankruptcy or similar proceeding.[7] The court applied collateral estoppel effect in determining that the debt was nondischargeable.

Other courts are in accord holding that consent or stipulated judgments satisfy the actually litigated requirement when the judgment or the record evidences the parties' intent. *See, e.g., In re Lacy,* 947 F.2d 1276, 1277–78 (5th Cir.1991) (a consent judgment is not necessarily denied collateral estoppel effect where depositions were taken, exhibits introduced and where the debtor agreed to stipulate to facts and agreed to the form of judgment); *Gilbert v. Ben–Asher,* 900 F.2d 1407, 1410 (9th Cir.), *cert. denied,* 498 U.S. 865, 111 S.Ct. 177, 112 L.Ed.2d 141 (1990) (judgment by stipulation was held to be conclusive if the parties have entered an agreement manifesting such intention); *Hartley v. Mentor Corp.,* 869 F.2d 1469, 1473 (Fed.Cir. 1989) (intent of the parties is generally controlling with respect to the preclusive effect of a stipulated judgment); Restatement (Second) of Judgments, § 27, comment (e) (1982) (a judgment should conclusively establish facts for the purpose of collateral estoppel only if that intention is evidenced by the stipulation).

■ The terms of a stipulated judgment are important in a dischargeability context. If the stipulation does no more than assess the amount of the judgment without any indication of the facts on which the judgment is based, then there is not a sufficient record on which to base collateral estoppel. *See, e.g., Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 867–68, 99 L.Ed. 1122 (1955) (consent decree for dismissal with prejudice did not refer to the parties' intention as to preclusion, particularly as to future litigation); *U.S. v. Int'l Building Co.,* 345 U.S. 502, 504–06, 73 S.Ct. 807, 808–09, 97 L.Ed. 1182, *reh'g denied,* 345 U.S. 978, 73 S.Ct. 1120, 97 L.Ed. 1392 (1953) (consent decree did not refer to preclusive intent nor express understanding of parties).

■ In this case, the parties agreed to stipulate to entry of a final judgment establishing the debtor's contractual liability on an agreed upon amount of principal and interest, in return for the dismissal with prejudice of all other claims and causes of action between the parties. The parties' intent was quite clear. They intended to dismiss all the claims now and forever. Berr states, rather correctly, that the parties even specifically negotiated and reached agreement on dischargeability of the claim in bankruptcy.

The FDIC suggested to Berr that a stipulated judgment be agreed upon since, as to the contractual liability claim, summary judgment was already granted in favor of the FDIC. The only claim remaining was the fraud claim. The parties began to negotiate. The FDIC's first draft contained a general agreement between the parties, dismissing all claims and causes of action between them. However, it also added an exception:

3. That all other claims and causes of action asserted by plaintiff or defendant and all claims or causes of action which could arise from the subject matter of this action or the bringing of this action, including any claims for abuse of process or

---

7. We need not address whether the prior waiver of discharge of the debt was binding. However, the attempted waiver is clearly relevant to show that both parties intended to be bound by the consent decrees in future proceedings such as bankruptcy.

malicious prosecution be dismissed with prejudice, *except that the claims asserted by plaintiff in Count II of its First Amended Complaint are preserved for the limited purpose of contesting or determining, in any bankruptcy proceeding, the dischargeability of the indebtedness of Edward Michael Berr to Federal Deposit Insurance Corporation, as Receiver for Indian Springs State Bank.*

(emphasis added).

Berr had rejected the proposed language. The FDIC contacted Berr's attorney and proposed a revised draft. In a letter sent to Berr's attorney, the FDIC stated that the revision was to address the concerns of Berr's attorney, namely the reservation of the fraud claim in a later dischargeability proceeding.

More specifically the letter stated:

I have revised the Stipulation and Joint Motion for Entry of Final Judgment, as well as, the proposed Order for the Entry of Final Judgment and enclose them for your consideration and execution. *The revisions were made to address the concerns which you expressed to Mr. Forland. I trust we may now dispose of this matter without further expense and delay.* My client has authorized me to effect dismissal in accordance with the terms set forth in the enclosed pleadings. Therefore, we may accomplish dismissal merely by signing and filing these pleadings and obtaining the Court's order. The need for further consideration by the client has been eliminated.

(emphasis added).

Based on the deletion of the reservation clause, Berr and the FDIC agreed to stipu-

late to the entry of judgment. On June 30, 1989, the stipulation was approved by the district court. The stipulated judgment provided:

IT IS FURTHER ORDERED that all other claims and causes of action asserted by plaintiff or defendant and all claims or causes of action which could arise from the subject matter of this action or the bringing of this action, including any claims for abuse of process or malicious prosecution are dismissed, with prejudice.

The FDIC now claims that it never intended to dismiss all future causes of action with prejudice, including nondischargeability actions, despite the express language in the stipulated judgment.[8] In a declaration of the FDIC's attorney of record, he claimed that:

At the time of ... the Stipulation and Joint Motion for Entry of Judgment, I anticipated that Mr. Berr might attempt to avoid payment of the settlement by filing a petition in bankruptcy. I was of the opinion that, under the applicable bankruptcy laws, FDIC would retain the right to object to the discharge of Mr. Berr's indebtedness in bankruptcy proceedings notwithstanding the dismissal of the civil action. Further, I was of the opinion that the law did not require FDIC to expressly reserve its rights to object to the discharge of Mr. Berr's indebtedness in order to exercise that right in a subsequent bankruptcy.

. . . .

I was prepared to delete the express reservation of FDIC's right to contest discharge

---

8. Berr asserts that the FDIC's attorney, by negotiating a revision while knowing the debtor's concern, states that the revision was to address the debtor's concerns, and was an implied representation. As such, the FDIC is equitably estopped from denying the truth of the revision. We agree. The FDIC had negotiated with Berr and his attorney repeatedly. At all times, Berr made his point quite clear, namely, that if he agreed to a stipulated judgment, the case would be dismissed with prejudice and the FDIC could not bring any suit arising from the subject matter including a nondischargeability complaint. As stated in a declaration filed by the FDIC's attorney, the FDIC assured Berr that the case would

be dismissed with prejudice while secretly believing that it could file a nondischargeability complaint in breach of the stipulated judgment.

Generally, equitable estoppel requires four elements: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the conduct to his injury. *In re Heritage Hotel Partnership I*, 160 B.R. 374, 378 (9th Cir. BAP 1993) (quoting *United States v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979)).

if the law independently accorded FDIC that right.

. . . .

I concluded that [the FDIC] could delete the express reservation . . . in light of *Daley.*

. . . .

I deleted the express reservation of FDIC's right to contest a discharge in order to overcome Mr. Berr's objection to the proposed Stipulation and to bring about a resolution of the civil action against Mr. Berr. At no point in time did I intend to waive FDIC's rights to later contest Mr. Berr's bankruptcy discharge.

The parties both entered into a stipulated judgment. Berr believed that by removing the reservation clause in the revised draft, the FDIC agreed to be bound by the preclusive effect of the stipulated judgment in any future bankruptcy as approved by the district court. We agree.

The conduct of counsel for the FDIC is highly questionable. That is, knowing that Berr was relying on the agreement to prevent a future nondischargeability action, the FDIC's counsel misled Berr by his apparently "secret" intent that under *Daley,* in spite of the dismissal with prejudice, he could later bring a nondischargeability action. This was clearly contrary to what Berr believed, that a dismissal with prejudice would prevent a subsequent nondischargeability complaint.

When parties agree to a dismissal with prejudice of a cause of action there is a clear statement of intent. Consequently, the stipulated judgment was intended to have preclusive effect in any future nondischargeability action as well as any other proceeding. Therefore, we hold that the parties actually litigated the fraud issue in the prior action and the parties intended that their stipulated judgment would have preclusive effect on the fraud issue.

### C. *Critical and Necessary*

■ In the prior action, the FDIC filed an amended complaint alleging that Berr had committed fraud when he obtained a loan. Both parties settled their outstanding claims and executed a stipulated judgment. That judgment was a critical and necessary part of the judgment in the prior action.

### D. *Final Judgment*

There is no question that the stipulated judgment entered by the district court constituted a final judgment. As such, the fourth prong of collateral estoppel was satisfied.

### 2. *Nondischargeability under 11 U.S.C. § 523(a)(2)(B)*

Although we have decided that collateral estoppel requires a dismissal of the nondischargeability complaint, it is also clear that the FDIC has failed to carry its burden of proof to establish the elements of its complaint under § 523(a)(2) at the eight day trial.

Section 523(a)(2)(B) states that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . .

(B) use of a statement in writing—

(i) that is materially ·false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B).

In determining whether a debt is nondischargeable, there are competing interests between a defrauded creditor who is allowed to recover only those damages caused by the fraud and the debtor's fresh start. This reflects the policy that a fresh start is for the "honest but unfortunate debtor," and not the defrauder. *Grogan,* 498 U.S. at 286–87, 111 S.Ct. at 659–60; *Siriani,* 967 F.2d at 306.

The requirements that must be shown under § 523(a)(2)(B) have been previously addressed in *In re Siriani*.[9] In *Siriani*, the Ninth Circuit stated:

> Section 523(a)(2)(A) differs from section 523(a)(2)(B) only in that the former involves a non-written misrepresentation while the latter involves a false statement in writing; in addition, section 523(a)(2)(A) provides less detail as to what a creditor must show. We conclude that, because the two subsections are substantially similar, adoption of the *Rubin* elements is appropriate for section 523(a)(2)(B) cases.

*Siriani*, 967 F.2d at 304.

The Ninth Circuit in *Rubin* held that a creditor must show:

(1) a representation of fact by the debtor,

(2) that was material,

(3) that the debtor knew at the time to be false,

(4) that the debtor made with the intention of deceiving the creditor,

(5) upon which the creditor relied,

(6) that the creditor's reliance was reasonable,

(7) that damage proximately resulted from the misrepresentation.

*In re Rubin*, 875 F.2d 755, 759 (9th Cir.1989); *see also In re Britton*, 950 F.2d 602, 604 (9th Cir.1991).

The creditor has the burden of proof to prove by a preponderance of the evidence all the elements. *Grogan*, 498 U.S. at 285, 111 S.Ct. at 658–59.

### a. Material Misrepresentations

■■■ As we have previously stated, a statement can be materially false if it includes information which is "substantially inaccurate" and is of the type that would affect the creditor's decision making process. *In re Greene*, 96 B.R. 279, 283 (9th Cir. BAP 1989).

■■■ The bankruptcy court cited three material misrepresentations by Berr in the credit application and financial statement.

First, the court stated that a material portion of Berr's regular income was falsely represented to be actual income when, in fact, it was not directly paid to Berr. The amount in question was $3,000 per month of deferred income. The financial statement asked for income. It did not ask for income to be divided among gross, net, actual, or deferred. The statement asked for salary and bonus and/or commissions. Berr filled in $3,000 for salary and $5,000 for bonus/commission. Berr testified that the $3,000 represented his accrued and earned income, although he chose to defer it.

Second, the court stated that property owned by Berr was inaccurately valued. The FDIC has contended that the valuation of the real property listed on the financial statement was mere "puffery." Berr merely stated the value of the land. The financial statement asked for market value of land and buildings. The credit application asked for the value of asset information. Neither asked for the amount of equity or debt on the properties. The values, according to Berr, were accurate as of the time the application was submitted.

Third, the court stated that other property was excluded. Berr contends that the omission of the Nevada property was not deliberate. The property had approximately $113,000 of equity. There was no evidence that this omission would have changed his credit worthiness.

The evidence has not shown that the misrepresentations were material. The evidence has only shown that Berr is contractually liable for the money loaned.

### b. Reasonable Reliance

■■■ The FDIC claims that under the *D'Oench, Duhme* doctrine, as codified in 12 U.S.C. § 1823(e) [10], the FDIC is deemed as a

---

9. *Siriani* was the first time the Ninth Circuit had ruled on what a creditor must prove in a nondischargeability action under § 523(a)(2)(B). *Siriani,* 967 F.2d at 304.

10. The statute, which provides that no agreement shall be valid against the FDIC unless it is in writing, was executed at the time the asset was acquired, was approved by the board of directors of the depository institution as reflected in the minutes, and has been continuously an official

matter of law to have relied solely on the written records of the bank as they existed at the time it was appointed receiver for the institution.

In *D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956, *reh'g denied*, 315 U.S. 830, 62 S.Ct. 910, 86 L.Ed. 1224 (1942), the Supreme Court held that the maker of a note could not present as a defense to its enforcement a "secret agreement" between the note's maker and the lending bank when the bank had been taken over by a federal insurer. This is said to further a federal policy to protect the FDIC and public funds which it administers against misrepresentations about the assets of insured banks.

In *Yarbrow v. Fed. Deposit Ins. Corp.*, 150 B.R. 233 (9th Cir. BAP 1993) we concluded:

> [The] application of the *D'Oench, Duhme* doctrine may satisfy the reliance element and causes of action under § 523(a)(2). Where a debtor acted in complicity with a bank to deceive examiners, the debtor should bear the consequences rather than the securities regulation process and the innocent depositors or creditors of the failed bank.

*Id.* at 239.

In this case, the *D'Oench, Duhme* doctrine is inapplicable. As we read *D'Oench, Duhme* the FDIC can rely on the doctrine only when there is a side agreement between the creditor (ISSB) and the debtor (Berr). In review of the record of this appeal, there has been no evidence offered that Berr and ISSB acted in complicity or otherwise with intent to deceive bank examiners. Berr was merely a borrower from a bank with a delinquent loan.

The bankruptcy court was in error in interpreting *D'Oench, Duhme* as creating a rebuttable presumption which satisfied the reliance element under § 523(a)(2).

■ Since we hold that there is no rebuttable presumption, we must now determine if the FDIC, nonetheless, proved by a preponderance of the evidence the issue of reliance.

record of the depository institution. 12 U.S.C.

As previously stated, § 523(a)(2)(B) requires that the creditor reasonably rely on the debtor's representations within the official loan documents. The bankruptcy court stated that the creditor did in fact rely on the loan documents, specifically, the credit application and the financial statement.

Berr has provided copies of both documents. He states that the credit application was incomplete. For example, the type of loan being applied for, the proceeds of credit, the proposed repayment date, other income, source of other income, and other matters were all left blank.

The personal financial statement is even more incomplete. For example, the effective date of the statement is missing, the applicant's identity, name, address, business, and residential phone numbers are missing, the assets and liabilities between the two documents are different. In addition, the total assets were understated by $53,000 and the outstanding mortgages were mathematically incorrect by $100,000, so as to overstate the net worth by $83,000.

Berr contends that he never intended to submit these incomplete documents to ISSB. There was testimony offered by a vice president and senior loan officer concerning proper bank lending procedures. That witness was not involved with Haiku investor loans and could not testify as to whether ISSB had relied on the documents. More specifically:

Q. Now, in 1982 you were a banker who made loans even though your loan limit may have been $15,000 you made loans based on wholly or part of personal financial credit applications. Right?

A. Yes.

Q. Okay. Had you as competent banker gotten a personal financial statement with the omissions shown on the Exhibit 4 and the mathematical error shown on Exhibit 4, would you have accepted or requested that the borrower make some sort of clarification?

. . . .

A. I would have made further inquiry.

§ 1823(e) (1–4).

Q. Now, I'd like to show you Exhibit 5 which is the credit application which ... [h]ad you in 1983 as a loan officer for a bank gotten a credit application with these omissions and these mathematical errors, would you have made further inquiry?

. . . .

A. If I would have received that person's loan indirectly I probably would have.

This appears to be the only evidence offered by the FDIC. We find that the evidence establishes at best only contractual liability. The requirements of § 523(a)(2)(B) have not been met.

## V. CONCLUSION

Since the parties intended that the stipulated judgment have preclusive effect by dismissing all causes of action with prejudice, and since the FDIC has not proven by a preponderance of the evidence that it reasonably relied on the loan documents, we REVERSE the judgment and REMAND the cause. On remand, the bankruptcy court is instructed to enter judgment in favor of Berr.

VOLINN, Bankruptcy Judge, concurring:

I concur with the majority's result, but wish to state that this case should be resolved solely on the grounds of equitable estoppel as set forth by the majority in footnote 8. I do not believe that the stipulation for dismissal would, simply by its terms, preclude a subsequent challenge to the dischargeability of the debt.

JONES, Bankruptcy Judge, dissenting:

## 1. Collateral Estoppel

Although this Panel exercises de novo review over the rules governing collateral estoppel, the application of collateral estoppel in a particular case is left to the broad discretion of the trial court. In re Gottheiner, 703 F.2d 1136, 1139 (9th Cir.1983); Garrett v. City & County of San Francisco, 818 F.2d 1515, 1520 (9th Cir.1987), (citing Mack v. South Bay Beer Distrib., Inc., 798 F.2d 1279, 1282 (9th Cir.1986)). Furthermore, in bankruptcy proceedings the use of collateral estoppel is subject to the caveat that, since bankruptcy courts have exclusive jurisdiction to determine dischargeability, it be applied cautiously. In re Towe, 147 B.R. 545, 548 (Bankr.D.Mont.1992), (citing In re Daley, 776 F.2d 834, 838 (9th Cir.1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986)).

Generally, where a judgment is entered by the parties' consent or stipulation [11] prior to trial on the issues, no issue may be said to have been fully, fairly or actually litigated for purposes of collateral estoppel.[12] With respect to consent or stipulated judgments, however, a form of issue preclusion has developed that is not dependent on actual litigation of a matter. Foster, 947 F.2d at 480, (citing Restatement, § 27 comment (e) & note at 269). Under this exception, "the [issue preclusive] effect results not from the rule of [Section 27] but from an agreement manifesting an intention to be bound." [13]

However, in determining whether the parties intended to foreclose the subsequent litigation of a particular issue, stipulated judgments asserted to give rise to collateral es-

---

**11.** For purposes of applying collateral estoppel, the similarity of judgments on stipulations and judgments by consents justifies their similar treatment. Moore's Manual: Federal Practice and Procedure, § 30.05[5] at 30–106 ("Moore's Manual"). In both situations, the "intent of the parties" in entering into either the stipulated or consent judgment determines its collateral estoppel effect since the issues have not been "actually litigated" or "necessarily decided" by the court in the sense that the doctrine normally requires. Id.

**12.** Restatement (Second) of Judgments (hereinafter "Restatement"), § 27 comment (e) at 257

(1982); Foster v. Hallco Manufacturing Co., Inc., 947 F.2d 469 (Fed.Cir.1991).

**13.** Restatement, § 27 comment (e); see also Green v. Ancora–Citronelle Corp., 577 F.2d 1380, 1383 (9th Cir.1978). But see Moore's Manual § 30.05[5] at 30–105 (noting that this rule has not been uniformly accepted by the courts); Anderson, Clayton & Co. v. United States, 562 F.2d 972 (5th Cir.1977), cert. denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978) (raising a rebuttable presumption that an issue resolved by stipulation is not conclusively established for purposes of a subsequent suit involving a different cause of action).

toppel must be narrowly construed. *Foster,* 947 F.2d at 481. In *Foster,* the Federal Circuit, noting the congruity with the Ninth Circuit,[14] stated, "[b]y requiring parties to be specific in qualifying the application of the general rules of issue preclusion, courts are not required to speculate as to the intent of the parties based on broad, general and ambiguous language." *Foster,* 947 F.2d at 481.

In *United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), the Supreme Court indicated that the scope of a consent decree is generally limited to its terms.[15] Accordingly, a stipulated or consent judgment must initially be reviewed within its four corners. *Armour,* 402 U.S. at 681, 91 S.Ct. at 1757; *Foster,* 947 F.2d at 481. In *Foster,* the parties sought to introduce extrinsic evidence on appeal to show what the parties intended or did not intend, by their consent decree. *Foster* 947 F.2d at 482 n. 20. While acknowledging that extrinsic evidence may be useful for a trial court in ascertaining what the parties intended the terms in their agreement to mean, the court declined to evaluate the relative strength of the parties' evidence on appeal. *Id.*

In the present appeal, the pertinent portion of the stipulated judgment states that "all claims of action which could arise from the subject matter of this action or the bringing of this action, including any claims for abuse of process or malicious prosecution [are] dismissed, with prejudice." The subject matter of the prior litigation involved a contract claim (Count I) and a related claim for fraud (Count II). The nondischargeability of Berr's debt to the FDIC was not a claim that "could arise from the subject matter of [the Kansas litigation]" since such a claim can not even potentially arise unless bankruptcy is filed, which, in this case, happened four years after the stipulated judgment was entered. Furthermore, as evidenced by the parties' specific reference to actions for "abuse of process" and "malicious prosecution," the parties knew how to clearly state their intent to waive potential future claims, yet they failed to address dischargeability proceedings which might arise in the event of a subsequent bankruptcy.

It is not appropriate for this panel to speculate as to the intent of the parties based on broad, general and ambiguous language. Appellant has failed to meet his burden of showing that the parties intended to qualify the application of the general rules of issue preclusion by foreclosing the opportunity to challenge dischargeability in the event of a subsequent bankruptcy. Accordingly, Berr's motion for summary judgment was properly denied and the bankruptcy court's decision to proceed with a hearing on dischargeability should be affirmed.

Alternatively, I would remand to the bankruptcy court for entry of findings as set forth below. The *Foster* court recognized that "[w]hile the interpretation of the terms of the decree is an issue of law, if resort must be made to conflicting extrinsic evidence to determine the parties' intent, we would be faced with a factual issue on which the trial court has not passed, at least not under the correct 'narrow construction' legal standard." *Id.; see also Favell v. United States,* 16 Cl.Ct. 700, 716 (1989) (citing *United States v.*

---

**14.** The *Foster* court stated that both circuits are guided by the views set forth in the Restatement. *Foster* 947 F.2d at 477, comparing *Jackson Jordan, Inc. v. Plasser American Corp.,* 747 F.2d 1567, 1575–78 (Fed.Cir.1984); *People of State of California v. Federal Communications Comm'n,* 905 F.2d 1217, 1245 n. 39 (9th Cir.1990); *Robi v. Five Platters, Inc.,* 838 F.2d 318, 321 n. 2 (9th Cir.1988).

**15.** *Armour,* 402 U.S. at 681, 91 S.Ct. at 1757. "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation. Thus, the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.*

*Sacramento Mun. Util Dist.*, 652 F.2d 1341, 1343–45 (9th Cir.1981). On remand, a bankruptcy court need only determine what issues, if any, were actually intended by the both parties to be resolved by the prior consent judgment. Thereafter, the trial court may exercise its discretion in determining, under the appropriate standards, whether to declare those issues established in the present litigation as a matter of collateral estoppel.

Finally, unless the Ninth Circuit adopts a contrary approach, I am bound under principles of *stare decisis*, to disagree with the majority's suggestion that if this had been an appeal from a state court judgment, federal law would nonetheless apply in evaluating the judgment's preclusive effect. *See In re Nourbakhsh*, 162 B.R. 841 (9th Cir. BAP 1994).

### 2. *Equitable Estoppel*

The application of estoppel against the government[16] is generally disfavored.[17] A party asserting estoppel against the government must carry a heavy burden. *United States v. Shampang*, 987 F.2d 1439, 1444 (9th Cir.1993). In addition to the traditional elements of equitable estoppel a movant must also prove the following additional elements to estop the government: (1) that the government engaged in "affirmative misconduct" going beyond mere negligence, and (2) that, on balance, not applying estoppel would result in a serious injustice, and the public will not be unduly burdened by the imposition of estoppel.[18] To establish affirmative misconduct, the movant must show "an affirmative

misrepresentation or [the] affirmative concealment of a material fact by the government." *Ruby*, 588 F.2d at 703–04. Appellant has failed to meet its heavy burden of showing both "affirmative misconduct" by the FDIC, and demonstrating that the balance of the equities favors the application of estoppel against the government.

---

16. The FDIC, when acting as the regulator or receiver of a failed bank, is a governmental entity. *See Fed. Deposit Ins. Corp. v. Baker*, 739 F.Supp. 1401, 1406–07 (C.D.Cal.1990) (declining to follow "proprietary" distinction in light of Congress' enactment of FIRREA; granting motion to strike equitable estoppel affirmative defense against the FDIC to the extent that it assumed a duty owed by federal regulators); *but see Fed. Deposit Ins. Corp. v. Harrison*, 735 F.2d 408, 412 (11th Cir.1984), (holding that when the FDIC acts in its corporate capacity as receiver, its liability must be determined in the same fashion as that of a private party).

17. *United States v. Ruby*, 588 F.2d 697, 703 (9th Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct.

2838, 61 L.Ed.2d 284 (1979); *United States v. Browning*, 630 F.2d 694, 702 (10th Cir.1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981).

18. *United States v. Shampang*, 987 F.2d 1439, 1444 (9th Cir.1993); *see also Ruby*, 588 F.2d at 703–04 (noting that even if a movant proves all estoppel elements, including affirmative misconduct, the movant would also need to show that, on balance, the equities in favor of estopping the government outweigh those inherent equitable considerations which the government asserts as the "constitutional trustee on behalf of the people").